**Javier MORA, Plaintiff,**

v.

**CHEM–TRONICS, INC., Defendant.**

**No. 97cv0851–J (JFS).**

United States District Court,
S.D. California.

July 1, 1998.

---

Patricia Ann Shiu, Catherine Albiston, Joannie C. Chang, Employment Law Center, A Project of the Legal Aid Society of San Francisco, San Francisco, CA, Marie Backes, San Diego, CA, for Plaintiff.

John D. Collins, Tara Leigh Wilcox, Sheppard Mullin Richter and Hampton, San Diego, CA, for Defendant.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND ORDER GRANTING AS MOOT PLAINTIFF'S MOTION TO STRIKE ALL OF DEFENDANT'S AFFIRMATIVE DEFENSES SAVE NUMBER NINETEEN, AND ORDER DENYING DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT**

JONES, District Judge.

Javier Mora ("Plaintiff") filed this instant action alleging that Chem–tronics ("Defendant") violated the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601 *et seq.* and the California Family Rights Act ("CFRA")

CAL. GOV'T CODE § 12945.2 *et seq.* Now before this Court is Plaintiff's motion for partial summary judgment as to liability on his: 1) third cause of action—violations of public policy under CFRA and FMLA; 2) fourth cause of action—discrimination under CFRA; 3) fifth cause of action—retaliation under CFRA; 4) sixth cause of action—unlawful employment practice under CFRA; and 5) seventh cause of action—interference with the exercise of rights under FMLA. Additionally, Plaintiff moves to strike Defendant's third, eighth, ninth, tenth, eleventh, nineteenth, and twenty-first affirmative defenses.

In its opposition, Defendant filed a cross-motion for partial summary judgment on Plaintiff's CFRA based claims found in the fourth, fifth, sixth, and in part third and seventh causes of actions. This matter came before the Court on Tuesday, May 26, 1998, at 10:30 a.m. with counsel of record appearing for both parties. After hearing oral argument, the Court took the matter under submission. After considering all of the paper filed in this action as well as the arguments by counsel the Court DENIES Plaintiff's motion for summary judgment. The Court GRANTS Plaintiff's motion to strike Defendant's third, eight, ninth, tenth, eleventh, and twenty-first affirmative defense. Plaintiff's motion to strike Defendant's nineteenth affirmative defense is DENIED. Finally, the Court DENIES the Defendant's cross-motion for partial summary judgment on Plaintiff's CFRA claims.

## I. Background

### A. Plaintiff's Son Javier, Jr.

In the 1980's Mr. Mora was awarded sole custody of his son, Javier Mora, Jr. ("Javier, Jr.") (Mora Decl. ¶ 4). (Def.'s Response to Plaintiff's Undisputed Statement of Facts "DUSF" ¶ 45).[1] From September 14, 1994, to October 3, 1994, Javier, Jr., was in the hospital. On September 22, 1994, Javier, Jr., was diagnosed with cryptococcal meningitis a rare blood disease contracted through exposure to pigeon droppings. At this time he

was also tested for HIV and diagnosed with an advanced HIV infection and full blown AIDS. (Mora Decl. ¶¶ 5–6). Javier, Jr., passed away on March 23, 1998. (Mora Decl. ¶ 20).

### B. Plaintiff's Employment

During Javier, Jr.'s, terminal illness, Mr. Mora was employed by Chem–tronics. Chem-tronics hired Javier Mora in 1986, as a handfinisher and later promoted him to Senior Handfinisher responsible for bringing aerospace parts into compliance with specifications. Chem-tronics has an attendance policy with terms as follows: Employees are assessed one-half of an infraction each time they are tardy, and one infraction for each unauthorized absence. Disciplinary action is imposed when an employee accrues three infractions in one rolling month, five infractions in two rolling months, or ten infractions in one rolling year. A verbal warning may be issued for the first violation, a written warning for the second, a final written warning for the third and termination for any additional violations. (DUSF ¶ 49). Employees must call within one-half hour of their start time if they will be late or absent. (DUSF ¶ 50).

On September 26, 1995, Plaintiff was fired for incurring 10.5 infractions in the previous twelve months, beginning in October of 1994. (Plaintiff's Undisputed Statement of Material Facts "PUSF" ¶ 45). Plaintiff contends that such termination was in violation of the FMLA and CFRA because at least three of these absences, on October 19, 1994, March 27, 1995, and September 26, 1995, were taken to care for his son. While Plaintiff contends most if not all of his absence or tardies other than these three days were also to care for his son, only these three days are specifically addressed by the parties with respect to his claims for wrongful termination.

### C. Overview of The FMLA

Congress enacted the FMLA to allow workers flexibility in scheduling time to deal with family and medical problems and allevi-

---

1. All cites to the statements of undisputed facts necessarily incorporate the references cited therein which the Court has reviewed.

ate some of the tension created by the competing demands of work and family. As the legislative history indicates:

> Private sector practices and government policies have failed to adequately respond to recent economic and social changes that have intensified the tensions between work and family. This failure continues to impose a heavy burden on families, employees, employers and the broader society. [The FMLA] provides a sensible response to the growing conflict between work and family by establishing a right to unpaid family and medical leave
>
> . . . .

Family and Medical Leave Act of 1993, S.Rep. No. 103–3, 103rd Cong., 2nd Sess. 4 (1993), reprinted in 1993 U.S.Code Cong. & Ad. News 3, 6 quoted in *Stubl v. T.A. Systems, Inc.*, 984 F.Supp. 1075 (E.D.Mich.1997).

One of the goals specifically delineated in the FMLA is to, "balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity." 29 U.S.C. § 2601(b)(1). The FMLA does not supplant employer-established sick leave and personal leave policies, rather it provides leave for uncommon and often stressful events such as caring for a child with a serious health condition. *See, e.g., Price v. City of Fort Wayne*, 117 F.3d 1022, 1023 (7th Cir.1997) (summarizing the goals of the FMLA).

The FMLA places affirmative obligations on employers to: 1) notify employees of their rights and obligations under the Act, 29 U.S.C. § 2619; 2) provide up to twelve weeks of unpaid leave to employees who qualify and provide sufficient notice to their employers, 29 U.S.C. § 2612; 3) refrain from disciplining employees from taking leave covered by FMLA, 29 U.S.C. § 2615; 4) reinstate employees to the same or equivalent job after their leave, 29 U.S.C. § 2614(a); and 4) continue the employees' health care during their absence. 29 U.S.C. § 2614(c).

Additionally, the right to FMLA and CFRA leave includes the right to take absence on an intermittent basis. 29 U.S.C. § 2612(b)(1); 29 C.F.R. § 825.203(d); CAL. CODE REG. tit. 2, § 7297.3(c)(2), (e). Employ-

ees may take leave in any size increments and employers may account for the leave in the shortest period of time the payroll system uses to calculate absences. 29 C.F.R. § 825.203(d) (final regulations); CAL. CODE REG. tit. 2, § 7297.3(c)(e). Intermittent leave is " 'medically necessary' if a family member's condition is intermittent, or if the employee is only needed to care of the family member on an intermittent basis." 29 C.F.R. § 825.116(c)(final regulations).

## II. Legal Standard for Summary Judgment

Plaintiff brings this motion for partial summary judgment for liability on its third, fourth, fifth, sixth, and seventh causes of action, pursuant to FED. R. CIV. P. 56(b). The standards and procedures for granting partial summary judgment, also known as summary adjudication, are the same as those for summary judgment. Accordingly, the Court may grant summary adjudication upon a showing that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party bears the initial burden of demonstrating that it is entitled to summary adjudication. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–61, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The burden then shifts to the nonmoving party to show that summary judgment is not appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To make such a showing the nonmoving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. *Id.*

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To determine if there is a genuine dispute of material facts the Court shall consider all admissible affidavits and supplemental documents submitted in a motion for summary adjudication. *See Connick v. Teachers Ins. and Annuity Ass'n*, 784

F.2d 1018, 1020 (9th Cir.), *cert. denied,* 479 U.S. 822, 107 S.Ct. 91, 93 L.Ed.2d 43 (1986). This includes discovery documents such as answers to deposition questions, and interrogatories. FED. R. CIV. P. 56(c). The Court, however, does not weigh evidence or make credibility determinations on a motion for summary adjudication. The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Anderson,* 477 U .S. at 255, 106 S.Ct. 2505.

### III. Defendant's Motion for Summary Judgment For Failure to Exhaust Administrative Remedies Must Fail

Defendant argues that Plaintiff cannot bring any claims for violations of CFRA because he failed to exhaust his administrative remedies. Defendant explains that the charge of discrimination that Plaintiff filed with the Department of Fair Employment and Housing ("DFEH") states that Mr. Mora believed he was fired because of his "family" and that he was told by his employer that it was "better for you and better for us because of son's illness." (Def.'s Mem. at 6). Despite the fact that there are specific boxes on the DFEH complaint for being denied "family leave" and for retaliation, they were not checked. Additionally, Defendant contends that while Plaintiff was asked to expand on his allegations in the body of the charge, all he said was that his termination was better for him and his employer because of his son's illness.

As a preliminary matter, the Court finds that Defendant's motion for summary judgment is untimely. The Court placed an April 6, 1998, deadline for filing any dispositive motions, yet Defendant raised this exhaustion issue in its opposition to Plaintiff's motion for partial summary judgment served on Plaintiff May 12, 1998, only five court days before the due date of its reply.

■ Nonetheless, Defendant's motion is unfounded and in the interest of efficiency the Court will dispense with it now. The parties agree that because CFRA is a part of Fair Employment and Housing Act ("FEHA") CAL. GOV'T. CODE § 12900 *et seq.* that before bringing a CFRA claim in federal court Plaintiff must have exhausted his administrative remedies. Under California law, employees must exhaust administrative remedies provided by FEHA by filing an administrative complaint with DFEH, and obtain a notice of a right to sue. *Okoli v. Lockheed Technical Operations Co.,* 36 Cal. App.4th 1607, 1613, 43 Cal.Rptr.2d 57 (1995) (summarizing the requirements of DFEH).

■ The federal counterpart of FEHA is Title VII of the Federal Civil Rights Act of 1964 ("Title VII") 42 U.S.C. § 2000e *et seq.,* which requires exhaustion through the Equal Employment Opportunity Commission ("EEOC"). Since the anti-discrimination objectives and public policy of the two statutes are the same, California courts rely on federal decisions to interpret the statutory requirements of exhaustion. *Sandhu v. Lockheed Missiles & Space Co.,* 26 Cal.App.4th 846, 31 Cal.Rptr.2d 617 (1994).

■ As a general rule, since lay persons initiate the administrative process for resolving employment discrimination complaints, the procedural requirements for FEHA actions are "neither interpreted too technically nor applied too mechanically." *Ong v. Cleland,* 642 F.2d 316, 319 (9th Cir.1981). The purpose of the administrative charge is to "provide the basis for the DFEH to investigate the aggrieved employee's claims of discrimination. It is not intended as a limiting device." *Watson v. Department of Rehabilitation,* 212 Cal.App.3d 1271, 1288, 261 Cal. Rptr. 204 (1989). To determine whether the allegations of the complaint are beyond the scope of the charge, the district court should construe the charge with the "utmost liberality," mindful of the fact that these charges are made by lay persons "unschooled in the technicalities of formal pleading." *Kaplan v. Int'l Alliance of Theatrical and Stage Employees et al.,* 525 F.2d 1354, 1359 (9th Cir. 1975). Claimants are not held to specify the charges with literary exactitude. *Soldinger v. Northwest Airlines, Inc.,* 51 Cal.App.4th 345, 382, 58 Cal.Rptr.2d 747 (1996). For example:

> [T]he crucial element of a charge of discrimination is the *factual* statement contained therein. Everything else entered on the form is, in essence, a mere amplifi-

cation of the factual allegations. The selection of the type of discrimination alleged, *i.e.*, the selection of *which box to check*, is in reality nothing more than the attachment of a legal conclusion of the facts alleged.

. . .

Consequently, we decline to hold that the failure to place a check mark in the correct box is factual error. In the context of Title VII, no one—not even the un-schooled—should be boxed out.

*Sanchez v. Standard Brands Inc.*, 431 F.2d 455, 456 (5th Cir.1970) (cited with approval in *Chung v. Pomona Valley Community Hospital*, 667 F.2d 788 (9th Cir.1982)).

■ Specifically, a Plaintiff's subsequent federal complaint must raise claims "like or reasonably related to the allegations" of the administrative charge. *Soldinger*, 51 Cal. App.4th at 382, 58 Cal.Rptr.2d 747 (1996); *Brown v. Puget Sound Electrical Apprenticeship & Training Trust*, 732 F.2d 726, 729 (9th Cir.1984) (citation omitted), *cert. denied*, 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985). If the new claims are not so related that they would not have been pursued by a reasonably thorough DFEH investigation of the original charge, then the district court must dismiss these claims to allow the DFE-HA an opportunity to pursue them first. *Id.* at 730; *see also Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir.1990) ("In short, the jurisdiction for Sosa's court action is not limited to the actual EEOC investigation, but can include the scope of an EEOC investigation which can reasonably be expected to grow out of the [initial charge].") (internal quotation marks and citations omitted).

■ Without question, the factual allegations in the First Amended Complaint can be deemed encompassed by a reasonable investigation of Plaintiff's administrative charge. Plaintiff's failure to check the box for the ultimate legal conclusion is not fatal. *See*, *Sanchez*, 431 F.2d at 456. Moreover, given the theory of Plaintiff's case, any failure on his part to realize that his termination violated his rights to take family leave, was arguably a direct result of Defendant's failure to appraise him of his rights pursuant to the Act.

Additionally, the fact that Mr. Mora alleged that he was fired, and that such adverse action involved his son's illness, makes it reasonable to expect that the potential CFRA violations would arise out of the charge. All of Mr. Mora's claims in this current suit are based on the same operative facts that proceeded his termination, namely that he was not notified of or afforded his rights under the FMLA, and this prevented him from taking an excused leave for his son's illness. Arguably, if true all of the alleged unlawful acts in the First Amended Complaint contributed to Defendant's ultimate decision to terminate Plaintiff for missing too much work, even though some absences were to care for his son. Hence, as Plaintiff correctly states, "all of the factual allegations in the first amended complaint would have been encompassed by a reasonable investigation of plaintiff's administrative charge alleging he was *fired* because of his family and his son's illness." (Pl.'s Mem. at 5). To come to any other conclusion would require Plaintiff to specify charges with literary exactitude which courts specifically caution against. *See, e.g., Soldinger*, 51 Cal. App.4th at 382, 58 Cal.Rptr.2d 747.

The Court will waste very little time addressing the cases cited within Defendant's brief. Each Ninth Circuit or California case relied on by Defendant is distinguishable. These cases involve exhaustion of remedies for acts of discrimination that occurred *after* the Plaintiffs filed their administrative complaints, which is clearly not at issue here. Accordingly, Defendant's cross-motion for summary judgment is DENIED.

### IV. Mr. Mora Was An Entitled Employee Under FMLA, and Provided Adequate but Not Necessarily Timely Notice to Defendant of the Need for Leave

#### A. Introduction

This case is brought pursuant to the FMLA and corresponding state statute CFRA. The parties do not dispute that because FMLA and CFRA statutory schemes are so similar cases addressing FMLA are instructive in interpreting CFRA claims. *See, e.g., Ely v. Wal\*Mart, Inc.*, 875 F.Supp.

1422, 1425 n. 6 (C.D.Cal.1995). Thus, outlining the requirements of the FMLA will suffice for the CFRA claims. The majority of the time in this Order the Court will only cite to the FMLA with the understanding that the equivalent provision is found in CFRA, and any legal analysis of the FMLA applies equally to the CFRA claims.

■■■■ Moreover, the Court will rely on the Code of Federal Regulations ("C.F.R."). Substantive agency regulations have the force of law if authorized by Congress and promulgated to implement a statute. *See, e.g., United States v. Walter Dunlap & Sons, Inc.,* 800 F.2d 1232 (3rd Cir.1986). Such regulations may supply the rule of decision in cases involving federal statutory claims. *Id.* In 29 U.S.C. § 2654, Congress specifically directed the Secretary of Labor to "prescribe such regulations as are necessary to carry out subchapter I of this chapter and subchapter." 29 U.S.C. § 2654. Hence, the C.F.R. will be cited to frequently as providing definitions and rules of law.

■■■■ Plaintiff contends that the interim regulations should apply to the instant case. Defendant does not respond to this position. The Department's interim regulations took affect on August 5, 1993, and the final regulations on April 6, 1995. *Victorelli v. Shadyside Hosp.,* 128 F.3d 184, 186 (3rd Cir.1997). Plaintiff's claims for wrongful termination rests on three absences/tardies taken by Mr. Mora on October 19, 1994, March 27, 1995, and September 26, 1995. Mr. Mora was fired on October 2, 1995. Courts look to the timing of the course of events surrounding the absences to determine which regulations should apply. *Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 761 n. 2 (5th Cir.1995); *Sims v. Alameda–Contra Costa Transit District,* 2 F.Supp.2d 1253 (N.D.Cal.1998). The course of events surrounding two of these three absences happened before the final regulations took effect. One absence, that of September 26, 1995, occurred after the final regulation took effect. Although the final decision to terminate Mr. Mora did not occur until after the final regulations went into effect, given that the majority of the events took place before the final regulations the Court will use the interim regulations unless otherwise stated. There is, however, no substantial difference between the provisions in the interim and final regulations at issue in this case. Therefore, regardless of which regulations the Court applies the outcome will be the same.

Additionally, the Court notes that Defendant has filed a separate document objecting to numerous pieces of evidence cited by the Plaintiff, and in fact objects to the vast majority of the documents used to substantiate Plaintiff's statement of undisputed facts. Defendant's approach is to provide a laundry list of objections apparently without much thought or analysis. After reviewing these broad objections and those consistently made during depositions, this Court finds that they are without merit and unless otherwise stated the parties are to assume that any objections necessarily implied by the Court's reference to specific evidence are overruled.

Finally, the FMLA provides that an employer may not interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under the FMLA. 29 U.S.C. § 2615. An employer may not retaliate against an employee who opposes actions by the employer that are, or that the employee reasonably believes to be in violation of the FMLA. An employer is prohibited from discharging or otherwise discriminating against employees for opposing any practice made unlawful by the FMLA. 29 U.S.C. § 2615. Several of Plaintiff's causes of action necessarily depend on a finding that Mr. Mora was entitled to the protection afforded by the FMLA. Thus, Plaintiff's request for summary judgment requires an analysis of whether he was entitled to FMLA leave on the three dates in question. Plaintiff must show that: 1) he was an entitled employee, 2) his son had a serious medical condition which required his care, 3) he properly notified his employer of his need for leave.

## B. Step 1: Plaintiff Was An Entitled Employee

■■■■ When it enacted the FMLA Congress found that "the lack of employment policies to accommodate working parents can force individuals to choose between their job security and parenting." 29 U.S.C.

§ 2601(a)(3). The FMLA covers employees that have worked for the employer for at least 1,250 hours during the 12–month period immediately preceding the start of the leave, have worked for the employer for at least twelve months, and the company employs fifty or more people within seventy-five miles of the employee's job-site. 29 U.S.C. § 2611(2). Plaintiff worked full time for more than nine years at Chem-tronics', El Cajon location, where it employed more than 600 employees during 1994 and 1995. It is undisputed that Plaintiff was an eligible employee working for a covered employer within the meaning of FMLA and CFRA. (DUSF ¶¶ 1–3).

## C. Step 2: Plaintiff's Son Had A Serious Medical Condition

The FMLA lists several situations for which an eligible employee is entitled to take twelve weeks of unpaid leave taken in a time block or on an intermittent basis. The Act includes leave to care for a child with a serious health condition. 29 U.S.C. § 2612(a)(1)(C). Accordingly, to satisfy step two of the analysis Plaintiff must show that Javier, Jr., had a serious health condition that necessitated care.

### 1. Serious Medical Condition

■■ As defined by the interim regulations a "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves:

1) Any period of incapacity or treatment in connection with or consequent to inpatient care, such as an overnight stay in a hospital, or

2) Any period of incapacity requiring absence from school or other regular daily activities of more than three calendar days that also involves the continuing treatment of supervision of a health care provider, or

3) continuing treatment of a health care provider for a chronic or long-term health condition that is incurable or so serious that, if not treated, would likely result in a period of incapacity of more than three calendar days.

 a) continuing treatment means one or more of the following:

1) the family member is treated two or more times for the injury or illness by a health care provider; or

2) the family member is treated for the injury or illness by a health care provider on at least one occasion which results in a regiment of continuing treatment under the supervision of the health care provider, for example a course of medication or therapy; or

3) the family member is under the continuing treatment under the supervision of but not necessarily being actively treated by, a health care provider due to a serious long-term or chronic condition or disability that cannot be cured. Examples include individuals with Alzheimers, persons who have suffered a severe stroke or persons in the terminal states of a disease who may not be receiving active medical treatment.

29 C.F.R. § 825.114(a)-(b)(3).

The final regulations are substantially similar, except they expand the meaning of continuing treatment to include a chronic serious health condition which is defined as: 1) requiring periodic visits for treatment by a health care provider, and 2) continues over an extended period of time, and 3) may cause episodio rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy). The final regulations further explain the meaning of a regiment of continuing treatment as including " a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen)." 29 C.F.R. § 825.114(b).

### (a) Javier, Jr.'s, Medical Condition

On September 22, 1994, Javier, Jr., was diagnosed with cryptococcal meningitis which typically requires continuing treatment with the prescription drug fluconazole, which must be taken indefinitely, and repeated lumbar punctures to ensure the meningitis is under control. (DUSF ¶¶ 5–6). The source of a cryptococcal meningitis infection is often aerosolized spores contained in soil contaminated with bird droppings. There were pigeons

roosting under the eaves where Javier, Jr., lived at the time of his diagnosis. (Dr. Dubey's Decl. ¶ 4). Javier, Jr. was hospitalized for his condition from September 14, 1994, to October 3, 1994. (DUSF ¶ 5). Since Javier, Jr.'s, form of meningitis was uncommon in patients with normal immunity he was tested for HIV. On September 22, 1994, he was diagnosed as HIV positive. A diagnosis of cryptocoecal meningitis is an advanced HIV infection thus he also met the case definition for having AIDS. (DUSF ¶ 7).

From the fall 1994, until his death in 1998, Javier, Jr., was treated with AZT, fluconazole, and Septra. Septra is an antibiotic used to prevent *Pneumocystis Carinii* pneumonia. His treatment later included the protease inhibitor Ritonavir and other anti-HIV drugs. (Dr. Dubey's Decl. ¶ 7). Javier, Jr.'s, HIV infection caused ongoing, chronic symptoms such as diarrhea, fatigue, profound immunosuppression, linear growth failure, poor weight gain, delayed puberty, and frequent respiratory infection. Javier, Jr., also experienced a number of secondary infections including herpes, pneumonia, frequent viral respiratory infections, and communicating hydrocephalus, a complication of cryptococcal meningitis. In August of 1997, Javier, Jr., was also diagnosed with abdominal Hodgkin's disease, a form of lymphoma. These health conditions and related illnesses required frequent visits to his health care provider. (DUSF ¶ 8). His HIV infection "made any illness, particularly an illness accompanied by a high fever, very serious and required continuing supervision by a health care provider." (Dr. Dubey's Decl. ¶ 8). From September 14, 1994, to October 2, 1995, Javier, Jr., had at least 30 visits to health care providers to treat his HIV infection, and related illnesses. His illness was deemed chronic by his treating physician. (Dr. Dubey's Decl. ¶ 10).

Following his hospitalization in September and October of 1994, Javier, Jr., required multiple lumbar punctures or spinal taps including one on October 19, 1994. In short, Javier Jr., developed communicating hydrocephalus, a complication of cryptococcal meningitis characterized by the inability of the brain to absorb spinal fluid. This condition required repeated spinal taps to drain off the spinal fluid and relieve the pressure on his brain. The increased pressure of spinal fluid on the brain could be life-threatening. (Dr. Dubey's Decl. ¶ 11). Between September of 1994, and October of 1995, Javier, Jr., was periodically too ill to attend school or do other regular daily activities. (Dr. Dubey's Decl. ¶ 12). Even when he was relatively stable Javier, Jr.'s, ongoing symptoms included diarrhea and fatigue. (Dr. Dubey's Decl. ¶ 17).

**(b) Javier Jr.'s Medical Condition Was Serious**

The only argument Defendant puts forth to argue that Javier, Jr.'s condition does not met the requirements of FMLA is that because the United States Supreme Court granted certiorari to consider whether an HIV infection is a disability covered by the ADA, *see Bragdon v. Abbott*, —— U.S. ——, 118 S.Ct. 554, 139 L.Ed.2d 396 (1997), HIV alone may not be a serious health condition. (Def.'s Mem. at 17). On June 25, 1998, the Supreme Court held that asymptomatic HIV virus is a disability under the ADA. *Bragdon v. Abbott*, —— U.S. ——, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). At any event, regardless of the Court's ruling, the ADA does not control the analysis of whether HIV is a serious heath condition under FMLA. Moreover, Javier, Jr., was not "just" HIV positive, he had full blown AIDS.

Without question, Javier, Jr.'s, condition easily satisfies one if not more of the requirements set forth in 29 C.F.R. § 825.114. First, Javier, Jr., was hospitalized for several weeks in 1994, and was diagnosed with HIV and AIDS, a condition that necessitates continued treatment of a health care provider. Second, Javier, Jr.'s, condition was chronic and long term in that there is no cure for HIV and the prognosis is death. Javier, Jr., was treated by health care providers at least thirty times in the relevant period and was placed on a regiment of continuing treatment, i.e., medication such as AZT, Fluconazole, and Septra. Finally, even if the Court found that Javier, Jr., was not necessarily being actively treated by a health care provider, at all times he had a serious chronic condition that could not be cured. The

C.F.R. cites Alzheimers as an example of a serious chronic condition that qualifies under FMLA. HIV and AIDS, fatal diseases are analogous. Javier, Jr.'s, conditions also qualify as serious under the final regulations which include all of the examples of the interim regulations and more.

### 2. The Meaning of "Care"

 Mr. Mora must also show that his son's serious medical condition required care. Caring for a sick family member encompasses both physical and psychological care. 29 C.F.R. § 825.116. "The term . . . includes providing psychological comfort and reassurance which would be beneficial to a seriously ill child or parent receiving inpatient care." 29 C.F.R. § 825.116(a). The term includes situations where the employee may be needed to fill in for others who are caring for the family member, or if the employee is needed intermittently, such as when care responsibilities are shared with another member of the family or a third party. *Id.* If an employer wants verification that the employee is needed to care for another individual, the Act dictates that the employer is to look to the health care provider as the source of such information, and formally request certification. 29 U.S.C. § 2612.

The Defendant never requested such information, but now argues that Plaintiff was not needed to care for his son because his son's step-mother was a stay at home mom, and/or hospice care may have sufficed. Additionally, completely ignoring the mandates of the Act, Defendant objects to the Plaintiff relying on a declaration by the treating physician to demonstrate that Mr. Mora's psychological comfort and care were necessary to his young son who faced death on a daily basis. Plus, relying on an inapplicable provision of CFRA Defendant asserts that because Mr. Mora has not shown that his son was incapable of self-care due to a physical or mental disability, his presence was not needed. This Court finds that all of Defendant's arguments are without legal basis.

First, Defendant cites no case law to support its position that the FMLA prohibits a parent from taking FMLA leave if another individual could provide care. The term "needed to care for" is statutorily defined and does not require an employee to demonstrate that no other caretakers be available before obtaining leave. Under the FMLA an eligible employee "shall be entitled to . . . leave . . . in order to care for . . . a son [who] has a serious health condition." 29 U.S.C. § 2612(a)(1). One of the progressive aspects of this law is that it permits either parent to take FMLA leave to care for a sick child and thus recognizes and validates the importance of both fathers and mothers to the lives of children. "The right to take leave under FMLA applies equally to men and women." 29 C.F.R. § 825.112(b) (final regulations). While in the situation where both employees work for the same company, the company may limit the total leave for both to twelve weeks, it cannot dictate which parent should take leave to care for the child. 29 U.S.C. § 2612(f). And, as recognized by the C.F.R., an employee may take leave intermittently if care responsibilities are shared with another member of the family. Such is the case here, as Mr. Mora who did not assist in each daily task necessitated by the disease, was the pillar of emotional and psychological strength for his son. For example, when Bob Wind and Mike Corcoran of human resources asked Plaintiff why his wife could not care of his son Plaintiff explained that he was closer for his son, that his son wanted him, and that Mrs. Mora was not Javier, Jr.'s biological mother. (DUSF ¶ 15). *See also* discussion of Dr. Dubey's Declaration *infra* at 16–17.

As Plaintiff points out, under the Defendant's interpretation of the law a father would not be entitled to be with his child as s/he died, if that child's mother, or any family member, was already present. Defendant's argument suggests that any care can and should be substituted for the care of a parent before FMLA leave is granted. This position is grossly inconsistent with the letter and spirit of the law. There is no basis in the FMLA for Defendant' position that because Javier, Jr.'s, stepmother may have not have been employed outside the home, or hospice care might have been available, that Mr. Mora was not entitled to take FMLA leave to support his dying child.

Second, through Dr. Dubey's Declaration, Plaintiff presented undisputed evidence that Mr. Mora provided psychological comfort and reassurance that was beneficial to a seriously ill child. Defendant objects to this evidence as an inadmissible opinion, lacking foundation, lacking personal knowledge, vague, conclusory, and irrelevant. As Plaintiff argues, all of these objection are without merit. Defendant's objections evade the explicit provisions of FMLA and CFRA. Both specifically state that a variety of health care providers, including medical doctors, are the individuals the employer is to turn to for certification that an employee is needed to provide physical care or psychological comfort for a child. 29 U.S.C. § 2612. *See also* 29 C.F.R. § 825.306(b)(5)(i) (child's health care provider may certify that "employee's presence to provide psychological comfort would be beneficial to the patient"); 2 CAL. CODE REG. § 7297.0(a), (a)(1)(d)(1) ("health care provider of the child" may certify that employee is needed to provide "psychological comfort as well as directly providing ... the medical care"). Additionally, while there is no indication that Dr. Dubey is relying on anything other than observations of the interaction of his patient and father, physicians may testify to facts regarding diagnosis, treatment and care, even if the source of those facts may otherwise be hearsay. FED. R. EVID. 803(4). Without question, Dr. Dubey is the appropriate individual to attest that Mr. Mora was needed to care for his son.

Turning now to Dr. Dubey's declaration, he states in the beginning that he is a doctor of medicine licensed to practice by the State of California and was the primary physician for Javier, Mora, Jr. Dr. Dubey explains that Javier, Jr.'s, condition was characterized in part by an inability of the brain to absorb spinal fluid. The condition required spinal taps to drain the spinal fluid and relieve the pressure on his brain because such increased pressure was life-threatening. Dr. Dubey then explains that,

[i]n the days prior to a spinal tap, Javier Jr. would suffer extremely painful headaches, often so painful that they would cause vomiting. Because he feared the spinal taps, Javier Jr. would attempt to hide his severe headaches and symptoms.

Consequently, Javier, Jr. needed his father both to monitor his condition and to accompany him to provide psychological support during the lumbar puncture procedures. (Dr. Dubey's Decl. ¶ 3). Dr. Dubey also explained that:

[I]t is apparent to me, based on my long history of treating Javier Jr., that he and his father, Javier Mora, had a very close relationship. Javier, Jr. wanted his father there for treatment and when he was ill. Javier Jr. experienced significant emotional distress as a result of his illness, and his father's psychological comfort was very important and beneficial to him. Mr. Mora provided psychological comfort and reassurance that was beneficial to his son when Javier Jr. received care both at home and in the hospital. Javier Mora, Sr. was also needed to provide physical care for his son when Javier Mora, Jr. received care at home. Often his father was the only one able to enforce the strict regimen of medication necessary to treat Javier Jr.'s HIV.

(Dr. Dubey's Decl. ¶ 14).

Given this declaration provided by the treating physician, the Court is satisfied that there is no genuine dispute that Plaintiff was needed to care for his son within the meaning of FMLA. Defendant has pointed the Court to nothing that undermines or contradicts this declaration.

Finally, Defendant's contention that Mr. Mora had to show that his son was incapable of self-care because of physical and mental disabilities is completely erroneous. The clause Defendant cites to relates only to an adult dependent child, meaning an individual who is eighteen years old or older. CAL. CODE REG. tit. 2 § 7297.0(c). It is undisputed the Javier, Jr., was between fourteen and fifteen years old from September of 1994, to September of 1995. Therefore, this section is completely irrelevant. Hence, Plaintiff has shown that he was entitled to FMLA leave to care for his son who had a serious medical condition.

**D. Step 3: Employee's Notice Requirements**

The FMLA specifically states that employees who want to take leave that is covered by the Act and such leave is foreseeable:

(B) Shall provide the employer with no less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave under such subparagraph, except that if the date of the treatment requires leave to be in less than 30 days the employee shall provide such notice as soon as is practicable.

29 U.S.C. § 2612(e)(2)(B).

The Act does not specify the form of notice that is required for foreseeable leave, and interestingly the Act makes no reference to any notice requirement for unforeseeable leave. The parties agree that for the absences in question the leave was **unforeseeable.**

The legislative history of the FMLA also does not mention the content of the notice that an employee must give, nor mention whether the employee must expressly invoke the FMLA when taking leave. *See, e.g., Manuel v. Westlake Polymers Corporation,* 66 F.3d 758, 761 (5th Cir.1995) (summarizing the legislative history concerning notice). Both the interim and final regulations specify the notice that is required for leave. 29 C.F.R. §§ 825.302, 825.303. The interim regulations provided that with foreseeable leave the employee must give, "at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). The regulation goes on to state that the employee "need not expressly assert rights under the FMLA or even mention the FMLA but may only state that leave is needed . . . ." *Id.*

The interim regulations with respect to unforeseeable leave state that an employee, "should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). This section does not contain the disclaimer found in § 825.302(c) that the employee need not expressly invoke the FMLA's protection.

The Fifth Circuit has persuasively reasoned that the absence of the disclaimer in the interim regulations does not impose a requirement that the FMLA leave be expressly invoked by employees who could not foresee the need for their absence. *Manuel,* 66 F.3d at 761. As the Fifth Circuit explained, other provisions in the interim regulations suggest that the Secretary did not intend for employees taking unforeseeable leave to expressly invoke the FMLA to satisfy their notice obligation. As stated in § 825.208(a)(1): "As noted in section 825.302(c), an employee giving notice of the need for unpaid FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet their [sic] obligations to provide notice though they [sic] would need to state a qualifying reason for the needed leave." 29 C.F.R. § 825.208(a)(1) quoted in *Manuel,* 66 F.3d at 761. This regulation provides that "[i]n all circumstances, it is the employers' responsibility to designate leave, paid or unpaid, as FMLA qualifying, based on information provided by the employee." 29 C.F.R. § 825.208(a)(2). If the employer does not have sufficient information about the employee's reason for leave it is the employer's burden and responsibility to "inquire further to ascertain whether the paid leave is potentially FMLA-qualifying." *Id.* As well stated by the Fifth Circuit, " [t]o require the employee to designate her leave as pursuant to the FMLA would render these provisions meaningless, if not directly contradict them." *Id.* at 761.

Finally, there is little doubt that Secretary intended that an employee does not have to specifically invoke his or her rights under the FMLA as the final regulations provide that "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303(b). Moreover, there is no indication that by the addition of this provision in the final regulations that the Department of Labor intended to remove a preexisting duty when requesting leave, indeed the Department of Labor's explanation of the amendment to the interim regulations does not even discuss its addition. 60 Fed.Reg. 2221 (cited in *Manuel,* 66 F.3d at 762).

Accordingly, to establish the requisite notice Plaintiff must show that he gave his employer notice "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). The notice must have been " sufficient to make the employer aware that the employee needs FMLA qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.303. Mr. Mora need not show that he expressly asserted rights under FMLA or even mentioned FMLA, but that he stated leave was needed. *Id.* If further information was needed to determine whether the leave requested qualified under the FMLA, it was Chem-tronics responsibility to inquire further of Mr. Mora for that information. 29 C.F.R. § 825.302(c).

> The employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken. In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave.

29 C.F.R. § 825.302(c).

Additionally, the FMLA did not require that Mr. Mora provide medical documentation of the serious health condition. Rather, the FMLA allows employers to request documentation that the medical need is serious if they desire. 29 U.S.C. § 2613 ("employer may require that a request of leave ... be supported by a certification issued by the health care provider of the eligible employee of the son, daughter, spouse or parent of the employee, as appropriate ...."). When the employee first gives notice of his need for leave, employers who want such medical certification must give the employee specific, written notice of the requirement and the anticipated consequences for failing to meet this requirement. 29 C.F.R. §§ 825.301(b)(1), (c); 825.305(a) (1995). Employers who fail to provide specific written request for medical certification may not take any action against the employee for failure to provide medical certification. 29 C.F.R. § 825.301(f) (final regulations). The Defendant never made any written request for medical certification of Plaintiff's son's condition. (DUSF ¶ 36).

The Ninth Circuit has yet to address the question of what qualifies as sufficient notice under the FMLA and/or CFRA. However, several other courts have visited the issue and produced compelling opinions. Whether the notice a Plaintiff provides is practical both in terms of its timing and content, "will depend upon the facts and circumstances of each individual case." *Manuel,* 66 F.3d at 764. *See also* 29 C.F.R. § 825.303. Generally, whether the notice is adequate is a question of fact. *See, e.g., Hopson v. Quitman County Hosp. & Nursing Home, Inc.,* 126 F.3d 635 (5th Cir.1997) ("[s]uch determinations are question of fact and better left to the jury with its traditional function of assessing human behavior and expectations"). Hence, even if there is undisputed evidence, rational tiers of fact could nevertheless differ on whether the notice was adequate. *Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973, 976 (5th Cir.1998). However, several courts have granted summary judgment for the employer and employee on the adequacy of notice for unforeseeable FMLA leave. *Id.; see also* cases cited *infra* at 1209–10.

The only issue with respect to notice that was briefed by the parties is the question of whether the content of the notice was adequate. At oral argument, however, Defendant said for the first time that the Court should not find as a matter of law that the timing of the notice was sufficient.

**1. The Content of the Notice**

As a general rule, "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." 66 F.3d at 764. As discussed in more detail below courts have found that notice may be sufficient when employees call employers to tell them that they or their children are sick and they will be absent from work. *See, e.g., Brannon v. OshKosh B'Gosh, Inc.,* 897 F.Supp. 1028 (M.D.Tenn.1995) (" On the mornings of January 10–11 and upon her return to work on

January 12, 1994, Plaintiff told Ms. Crisp that her daughter was sick. This was sufficient to put Oshkosh on notice that the leave potentially qualified under 29 U.S.C. § 2612(a)(1)(C)."); *McClain v. Southwest Steel Company, Inc.*, 940 F.Supp. 295 (N.D.Okla.1996); (finding a material issue of fact as to whether Plaintiff provided sufficient notice when he called in sick); *Hendry v. GTE North, Inc.*, 896 F.Supp. 816 (N.D.Ind.1995) (finding that the Plaintiff arguably complied with the notice requirement when she called her employer and reported herself ill with a migraine headache.). Additionally, for employees who make their employers aware that they or a family member suffers from a chronic illness, and subsequently call in sick because of that illness, a generalized notice may suffice. *See, e.g., Rhoads v. Federal Deposit Insurance Corporation*, 956 F.Supp. 1239, 1256 (D.Md.1997) (employee who had severe allergy to smoke and took time off because of that condition gave sufficient notice when she subsequently called in "indicating that she still did not feel well enough to work."); *Peters v. Community Action Committee, Inc. of Chambers–Tallapoosa–Coosa*, 977 F.Supp. 1428 (M.D.Ala. 1997) (finding that employee could be found to give sufficient notice "so long as she gave notice of her daughters' serious health condition for which she was taking leave.").

### (a) The October 19, 1994, Tardy

On October 12, 1994, Mr. Mora gave Mrs. Scherkenback, the Company nurse and Health Administrator at Chem-tronics, a note on which she documented that his "son has pigeon infection. Javier Mora must be able to take his son to M.D. when his spinal pressure is going up. It is critical to do a spinal puncture." (Scherkenback Dep. "Pl.'s Ex. E" at 33:10–14).[2] After receiving the note Mr. Mora came into her office to explain his son's illness and he said "he must be able to take his son when—he's very ill." (Pl.'s Ex. E at 34:21–23). She also recalled that Mr. Mora said his son would become ill. At

this time it was Nurse Scherkenback's understanding that spinal pressure "is an abnormal high pressure to have a spinal infection. It's just like meningitis. If you have a meningitis, you're going to possibly have a high pressure of spinal fluid." (Pl.'s Ex. E at 35:15–18).

On October 19, 1994, Nurse Scherkenback received a copy of the consent form Mr. Mora signed for a spinal tap for his son. On this note Nurse Scherkenback wrote that "on 10–18 Javier was off all day, on 10–18 Tuesday, Javier took his son to Kaiser and scheduled Javier for—Javier—for a spinal tap on 10–19." (Pl.'s Ex. E at 39: 1–5; Ex. 3).

The parties do not dispute that on October 19, 1994, Mr. Mora was not given an infraction for leaving early to take his son to the spinal tap procedure. (Def.'s Attendance Summary "Ex. 10"; Plaintiff's Response to Defendant's Undisputed Statement of Facts "PRDUSF" ¶ 59). Rather, Mr. Mora was given an infraction on October 19, 1994, for being two minutes late to work in the morning. (PRDUSF ¶ 58).

Plaintiff, however, "maintains that he should not have incurred an attendance infraction for arriving to work late on the morning of October 19, 1994, because he was needed to care of his seriously ill son during the night of October 18 and early on the morning hours of October 19." (PRDUSF ¶ 59). Plaintiff stated in his response to the Defendant's request for admissions that on the morning of October 19, 1994, "time away on this date was to care for his seriously ill son." (Pl.'s Response to Defendant's Request for Admissions "Ex. I" ¶ 59).

It is significant that Plaintiff was not given an infraction for time off in the afternoon of October 19, 1994. The issue is whether Plaintiff put his employer on notice that he was entitled to intermittent leave under the FMLA for the two minutes he missed of work on the morning of October 19, 1994. Plaintiff has offered no evidence that he ever mentioned that he was late because of Javier,

---

**2.** In their undisputed statements of fact the parties make much of the issue of which supervisors and managers knew what about Javier, Jr.'s, condition and when. Such a debate is irrelevant. Nothing in the FMLA dictates that Plaintiff

needed to call his supervisor or managers. And Defendant concedes that the information he gave to the company nurse on the days in question was sufficient to impart knowledge of the condition on the Defendant.

Jr.'s, sickness. It appears that Plaintiff's argument is that because he notified his employer a few days before that his son had an illness that would require spinal taps, and because he provided a note that he would need to miss part of the work day on the nineteenth to take his son to a spinal tap appointment, the burden shifted to his employer to determine whether the two minute tardy was related to his son's illness and qualified for leave under the FMLA.

Plaintiff does not cite any cases to support the proposition that because he notified his employer of his son's medical condition and that he would need to miss work when it required grave procedures, that as a matter of law the employer was sufficiently notified that each and every absence or tardy might be related, such that it triggered the duty to inquire further for each subsequent infraction.

The facts related to this infraction are distinguishable from those in the cases cited by Plaintiff. In *Brannon,* an employee missed work to care for her daughter who had a high fever. Plaintiff called in to work on both days and said that her daughter was too sick for her to come to work. Additionally, her husband provided a note from the doctor explaining her condition. The Court found that Plaintiffs notice was sufficient as a matter of law and entered summary judgment in her favor. 897 F.Supp. at 1039.

In *Brannon* **each time** the employee needed to miss time from work she called the employer and explained her absence was caused by her daughter's sickness. Conversely, in the instant case Plaintiff notified his employer that he needed to take the day off on the eighteenth and the afternoon of the nineteenth for his son's spinal tap. But, when Plaintiff needed to miss time from work on the morning of the nineteenth he did not tell his employer that it resulted from his need to be with his son either late in the previous night or the early morning. Hence, *Brannon* is distinguishable.

In *Rhoads,* the Plaintiff worked at home for several months because of her severe allergy to smoke. As a result of such accommodations her employer was aware of her condition. Shortly after returning to work,

after this prolonged absence, the employee called her supervisor and told him that she had a headache, did not feel well enough to come to work, and expected to be absent for one week to recuperate. 956 F.Supp. at 1256. She gave notice again on a subsequent date indicating that she still did not feel well enough to work. *Id.* The court found that there was a genuine issue of fact concerning whether verbal notice given on these two days, given her employer's awareness of her chronic condition, was sufficient to reasonably appraise the employer that she wished to take time off due to her serious health condition.

Contrary to the facts in this case, in *Rhoads,* while the employer was aware of the employee's chronic condition, each time she was absent the employee also made some reference to the fact that she was sick or ill. Even though Plaintiff made his employer aware that his son suffered from a serious illness, with respect to October 19, 1994, Plaintiff did not make any reference to the fact that he was two minutes late because of his son's illness.

■ In sum, Plaintiff has not presented the Court with facts to show that he told his employer that he was late on the morning of October 19, 1994, due to his son's illness. Plaintiff has not pointed the Court to any cases that hold that notifying an employer that the employee and/or employee's family member suffers from a serious illness, triggers the burden of the employer to inquire if FMLA leave is applicable to any absence or tardy. Therefore, this Court will not find that as a matter of law Plaintiff's notice was sufficient. Whether or not this notice was adequate is a question for the jury.

**(b) The March 27, 1995, Absence**

**(i) The Phone Call**

On March 27, 1995, Plaintiff called his employer at 10:30 a.m. (Pl.'s Ex. E at 10:23–25). Mr. Mora told her that his son was HIV positive. (Pl.'s Ex. E at 11:1–3). He asked nurse Scherkenback to tell Mr. Richardson, his supervisor of several years, because he felt that he verbally could not do it without breaking down. (Pl.'s Ex. E at 12:15–17).

Nurse Scherkenback placed in her notes, " He is home again today, his son's fever was very high and he cannot leave him when he is so ill." (Pl.'s Ex. E at 12:1–4). She recalled Mr. Mora telling her that his son was "very ill." (Pl.'s Ex. E at 12:8–10). He conveyed to her that he wanted to use his sick time. (Pl.'s Ex. E at 15:24–28).

On March 28, 1994, Bob Wind called nurse Scherkenback to ask about the problems Mora was having. She explained to him the health status of his son and that he needed to be very confidential and discrete about Javier, Jr.'s, condition. (Pl.'s Ex. E at 15:24–28). She explained to him that she had Doctor's notes from 10–12, 10–18, 10–19, 3–13. (Pl.'s Ex. E at 22:17–27).

On March 30, 1994, nurse Scherkenback had a conversation with Ms. Morse the director of human resources. Ms. Morse instructed nurse Scherkenback that because Mr. Mora's attendance was so bad she could not accept any more Doctor's notes. (Pl.'s Ex. E at 23:25–24–7).

■ This Court finds that, as a matter of law, a reasonable jury must find that an employee who told his employer that his son was HIV positive and had a very high fever and that he "cannot leave him when he is so ill," provided sufficient notice that he needed leave because of his son's serious medical condition. First, as a matter of common sense an employer who hears in the same conversation that an employee's child has HIV, has a very high fever, and is sick so sick he cannot be left, should and would conclude that a serious medical condition was involved. Especially in light of the fact that the individual told was a medical nurse.

### (ii) Bolstering Case Law

This Court's conclusion is bolstered and supported by the one case presented in the same procedural posture—a Plaintiff's motion for summary judgment. *Brannon v. OshKosh B'Gosh, Inc.*, 897 F.Supp. 1028 (M.D.Tenn.1995). *Brannon*, stands for the proposition that telling an employer that a son or daughter is sick may be sufficient notice. In *Brannon*, the Plaintiff stayed at home from work for two days to care for her

daughter who was suffering from a high fever, sore throat and respiratory infection. *Id.* at 1032. On both days of her absence Plaintiff told her Human Resources Manager that she would be absent from work because of her daughter's illness. In addition, her husband delivered a note to her supervisor explaining her absence. To reach its decision about notice the court appears to have relied solely on the fact that the employee called in and said her daughter was sick. The court stated that, " On the mornings of January 10–11, and upon her return to work on January 12, 1994, plaintiff told Ms. Crisp that her daughter was sick. This was sufficient to put OshKosh on notice that the leave potentially qualified under 29 U.S.C. § 2612(a)(1)(C)."

Similarly, in the instant case Plaintiff called his employer and stated that his son had a very high fever and was very sick. Moreover, assuming—even though it did not appear important to the court's ultimate decision in *Brannon*—that providing a further explanation of the illness was important, like the Plaintiff in *Brannon*, Mr. Mora explained his son's condition stating that he was HIV positive.

Defendant's position, however, is that the statement given to the nurse was not enough to place Chem-tronics on notice that his leave was FMLA qualifying, because he called the company nurse and said he "just felt it was time" to tell her that his son was HIV positive and "did not tell the nurse that his son was being hospitalized, that his son was receiving ongoing treatment or that the fever was in any away related to the HIV condition." (DUSF ¶ 64). This argument not only mischaracterizes the testimony, and flies in the face of common sense, it also improperly places on the Plaintiff the burden to fully explain how the leave qualifies under the FMLA.

### (iii) Defendant Mischaracterizes Mr. Mora's Phone Call

First, Mr. Mora did not just call the company nurse because he felt it was time to tell her that his son was HIV positive. Rather, after Mr. Mora told nurse Scherkenback that his son was HIV positive he asked her to tell

Mr. Richardson—his supervisor of several years of his son's disease, because he felt that he verbally could not do it without breaking down. (Pl.'s Ex. E at 11:15–17). Significantly, the obvious impetus for his call was the fact that his son had a high fever and was very ill, which necessitated his absence from work. Nurse Scherkenback put in her notes, " He is home again today, his son's fever was very high and he cannot leave him when he is so ill." (Pl.'s Ex. E at 11:1–4). She recalled Mr. Mora telling her that his son was "very ill." (Pl.'s Ex. E. at 12:8–10).

### (iv) Defendant's Stance Ignores Basic Common Sense

It defies common sense to argue that because Mr. Mora did not say that the fever was in any way related to the HIV condition the employer was not on notice that his need to stay home with his son was FMLA qualifying.' This position taken by Defendant implies that employees should have ·sufficient medical knowledge to explain specifically how and when particular symptoms or problems are related to a serious health condition. The FMLA does not require such specificity. Telling an employer all in the same conversation that a child has a high fever and is HIV positive would put any Defendant on notice that this was a FMLA situation.

### (v) Defendant Improperly Allocates the Duty to Investigate Further On Plaintiff

Moreover, if an employer is not sure whether an employee's leave qualifies it has the burden to inquire further. It may, for example, request medical certification. 29 U.S.C. § 2601(b)(2). Additionally, the employer has the responsibility to determine whether time off, paid or unpaid is FMLA or CFRA qualifying. 29 C.F.R. § 825.208(a), 825.303(c) (final regulations). By their argument Defendant asks ·this Court to hold that because: 1) an employee did not specifically explain to the company's nurse practitioner that HIV involves numerous visits to the doctor, inpatient care, and a regiment of medication or continuing therapy, and/or 2) because an employee did not explain that a high fever is related (be it a consequence or

threat) to the HIV virus, then 3) it is reasonable to assume that the employer was not notified that the request for a day off qualified under the FMLA. This Court finds that given the information provided by the Plaintiff, no reasonable jury could conclude that he failed to satisfy his burden under FMLA to notify his employer that the leave was necessitated for a serious medical condition.

### (vi) Defendant's Position is Not Supported by Case Law

Defendant's argument that as a matter of law a mere statement that a family member is ill does not provide sufficient notice to the employer that the employee's absence is FMLA or CFRA qualifying is erroneous. Courts have found that notice may be sufficient when employees call employers to tell them that they or their child is sick and they will be absent from work. *See, e.g., Brannon v. OshKosh B'Gosh, Inc.,* 897 F.Supp. 1028 (M.D.Tenn.1995); *McClain v. Southwest Steel Company, Inc.,* 940 F.Supp. 295 (N.D.Ok.1996); (finding a material issue of fact as to whether Plaintiff provided sufficient notice when he called in sick); *Hendry v. GTE North, Inc.,* 896 F.Supp. 816 (N.D.Ind.1995) (finding that the Plaintiff arguably complied with the notice requirement when she called her employer and reported herself ill with a migraine headache.).

In *McClain,* the plaintiff "called in sick on the morning of June 14." 940 F.Supp. at 299. The Defendant raised the affirmative defense that Plaintiff failed to provide sufficient notice of his absences and was precluded from seeking its protections. The Court summarily stated that the employee did not have to even mention the FMLA when requesting leave for a serious health condition. "If the employer does not have sufficient information about the employee's reason for taking leave, 'the employer should inquire further to ascertain whether the paid leave is potentially FMLA qualifying.'" *Id.* at 300 (quoting 29 C.F.R. § 825.208(a)(2)). Thus, the court would not allow the defendant to succeed on a motion for summary judgment based on inadequate notice.

In *Hendry,* the Plaintiff called her· employer and reported herself ill with a migraine

headache. The Court found that "Hendry arguably complied with this [notice] requirement when she reported her illness on February 23, 1994. At that point, the employer had a responsibility to inquire further of Hendry about whether FMLA leave was being sought and to obtain the necessary details of the leave to be taken." 896 F.Supp. at 828.

Plaintiff's case is much stronger than the *Hendry* and *McClain.* Not only did Plaintiff say that his son was sick with a very high fever, he also explained that his son suffered from HIV. Thus, Plaintiff gave more than sufficient information which shifted the burden to the employer to inquire further as to whether FMLA leave was applicable.

■ Additionally, when employees make their employers aware that they or a family member suffers from a chronic illness, and subsequently call in sick because of that illness, their notice may suffice. *See, e.g., Rhoads v. Federal Deposit Insurance Corporation,* 956 F.Supp. 1239, 1256 (D.Md.1997) (employee who had severe allergy to smoke and took time off because of that condition gave sufficient notice when she subsequently called in "indicating that she still did not feel well enough to work."); *Peters v. Community Action Committee, Inc. of Chambers–Tallapoosa–Coosa,* 977 F.Supp. 1428 (M.D.Ala. 1997) (finding that an employee could be found to give sufficient notice "so long as she gave notice of her daughters' serious health condition for which she was taking leave."). The fact that the Plaintiff did not specifically state that the fever and the HIV were interrelated such that one had an effect on or caused another is immaterial. The discussion of the two in close proximity in a short conversation obviously notified the employer that it could and should inquire further as to whether FMLA leave was sought or applicable.

Defendant's citations to *Gay v. Gilman Paper Co.,* 125 F.3d 1432, 1436 (11th Cir. 1997), *Carter v. Ford Motor Co.,* 121 F.3d 1146, 1147 (8th Cir.1997), and *Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973, 978 (5th Cir.1998) are unavailing. First, in *Gilman,* on behalf of the employee the employee's spouse provided very little information to the employer regarding her absence. He merely told her supervisor that she was not at work because she was in the hospital having some tests run. He admitted in his deposition to lying about her whereabouts and her condition, and instructed his sons to do the same. *Id.* In truth, his wife had a nervous breakdown and was admitted to a psychiatric hospital. The court held that the little and erroneous information provided was not sufficient to require the employer to inquire further. In the instant case, Mr. Mora provided much more information, specifically that his son was HIV positive and had a very high fever, and when he was "so sick" his presence was necessary. There was no deception or misinformation. *Gilman* is inapposite.

Second, in *Carter,* the employer stated only that he had a personal problem when asked by his supervisor about the nature of his illness. He provided no information to indicate that the leave was FMLA-qualifying. He also failed to comply with an instruction that he report to work or provide a reason justifying his continued absence. 121 F.3d at 1148. Mr. Mora was not at all evasive with the nurse on March 26, 1994. Additionally, he was never asked to provide any medical documentation confirming his son's status as of March 26, 1994. Thus, this case is not compelling to the Court.

Finally, in *Satterfield,* the employee's mother contacted her supervisor stating that her daughter had a lot of pain in her side and would not be able to work that day but would work on one of her days off. 135 F.3d at 980. The Court noted that "while an employers' duty to inquire may be predicated on statements made by the employees, the employer is not required to be clairvoyant." *Id.* (citing *Johnson v. Primerica,* 1996 WL 34148 at *5 (S.D.N.Y.1996). An employer who is told that an employee's son is HIV positive and has a very high fever does not need to be clairvoyant to determine that the son has a serious medical condition, or that further inquiry was necessary. Such a conclusion is a matter of common sense.

Additionally, while the Court in *Satterfield* was persuaded by the fact that the Plaintiff had previously taken FMLA leave before and in the three weeks prior had three unexcused

absences, there is no similar showing here. Defendant makes reference to the fact that Mr. Mora took a leave of absence in August of 1995. This is not at all relevant to the Plaintiff's knowledge in March of 1994. Plus, this absence was for his own sickness which only lasted for one day and would not qualify under either FMLA or CFRA.

Defendant also argues vehemently that because the Plaintiff had a history of tardies and absences over his eight years of employment with Chem-tronics, it was lead to believe that his attendance problems were not related to a serious health condition. Under this theory Defendant posits that it had no duty to investigate whether its obligations under FMLA or CFRA were triggered. This argument is also without merit. While the Court considered absentee problems in *Saddleback,* notably several absences occurred within weeks of the day in question. There is no similar showing here. Additionally, unlike the Plaintiff in *Satterfield,* on the date in question Plaintiff specifically stated the medical reasons identifying by name a particular ailment that was obviously involved, HIV. Thus, the Defendant's so called logical assumption that his failure to show up to work was not related to a serious health condition given his history of absences dating back to 1986, is completely contrary to the information Plaintiff imparted on the day in question. Finally, the FMLA requires that employers inquire further to determine whether the FMLA is implicated. This Defendant did not do.

#### (vii) Javier, Jr.,'s Ability for Self–Care is Irrelevant

Citing to an inapplicable provision of CFRA and FMLA Defendant's next argument is that because Plaintiff did not notify Chem-tronics that his son was incapable of self-care or that he needed the day off for the purpose of caring for his son his notice was inadequate. This argument is baseless. *See* discussion *supra* at 1207–08.

#### (viii) Plaintiff Did not Effectively Waive His Rights Under FMLA

Finally, Defendant argues that because Mr. Mora did not tell·Chem-tronics that he wanted a leave of absence to care of his son and specifically "refused to take leave," including FMLA, he did not evidence the intent to invoke the protection of the statute First, it appears that this discussion that Defendant refers to occurred after Plaintiff's absence on March 27, 1994. As a result of this absence, Mr. Wind contacted nurse Scherkenback to get information related to Plaintiff's absences. Mr. Wind only explained that he met with Plaintiff in mid-March.

Second, even assuming this meeting occurred before Plaintiff's absence, Plaintiff did not refuse to take FMLA leave. Rather Mr. Wind misleadingly stated that family leave was without pay to which Plaintiff responded that if "it is without pay I'm going to have a problem." (Def.'s Wind Deposition ("Def.'s Ex. 3") at 88:26–23). Third, even if this could be characterized as a refusal, Defendant could not use this to argue that Plaintiff did not provide sufficient notice, because Mr. Wind incorrectly advised Plaintiff that the leave was without pay when FMLA/CFRA permits the substitution of accrued sick leave or vacation leave to cover any family/medical leave. Nor did Mr. Wind explain that absences related to care for his son would not be counted as infractions. (PRDUSF ¶ 66). In fact, it appears that Mr. Wind knew little to nothing about FMLA. During his deposition he could not say if Chem-tronics had a FMLA policy in 1994–1995 (Pl.'s Wind Dep. "Pl.'s Ex. C" at 6:10–16). He would not and could not explain to the attorney what rights an employee had under the Act. (Pl.'s Ex. C at 7:8–28).

This Court is unpersuaded by Defendant's argument that if Plaintiff discussed the FMLA with his supervisor prior to his absence on March 27, 1994, any subsequent notice he may have given to his employer was insufficient and did not require further inquiry. Notably, Defendant cites no case law to support this argument.

In conclusion, the Court finds that as a matter of law Plaintiff gave sufficient notice to his employer of his desire to take leave that qualified under FMLA on March 27, 1994.

**(c) The September 26, 1995, Tardy**

 It is undisputed that Plaintiff incurred an infraction for arriving to work two hours late on September 26, 1995. (PRDUSF ¶ 71). Plaintiff, however, contends and Mr. Corcoran admits that Mr. Mora stated " that his son was HIV and was sick that morning and that's why he did not come in on time." (Def.'s Ex. 4 at 68:5–7). Incorporating the discussion above this Court finds that the content of the notice was sufficient. In brief, Mr. Mora told his employer that his son was HIV positive and sick that morning, which put the employer on notice that FMLA leave was applicable. *See* discussion *supra* at 1207–10. Any argument that the employer was not sufficiently aware that his son had a serious medical condition is disingenuous especially in light of the fact that in April of 1995, the Company ran a story in its newsletter about Mr. Mora and his son's trip to the Superbowl through make a wish foundation—a foundation that grants wishes to terminally ill children. (Def.'s Ex. 14).

**2. The Timing of the Notice**

Neither party briefed the issue of the timing of the notice on any of the dates in question. However, at oral argument Defendant took the position that it there are questions of fact as to whether the timing of Mr. Mora's notice was adequate. Under both the interim and final regulations when the need for leave is unforeseeable then an employee should give notice "as soon as practicable under the facts and circumstances of the particular case." § 825.303. The regulations provide that in the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, "written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved." § 825.303(a) (final regulations).[3] Additionally the regulations provide that:

> "The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ('fax') machine or other electronic means. Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally .... The employer will be expected to obtain any additional required information through informal means. The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation."

§ 825.303(b) (interim and final regulations).

**(a) October 14, 1994, Tardy**

 As discussed above Plaintiff was two minutes late to work on the morning of October 19, 1994. He contends that he should not have been assessed a tardy for that day because he needed to care for his seriously ill son on the night of October 18, and early in the morning hours of October 19. Mr. Mora gave his employer a general note on October 12, 1994, about his son's medical condition and informed his employer that he needed to care for his son whenever he was very ill. However, Plaintiff did not put forth any facts to show that on October 19, 1994, he mentioned to his employer that he was late because of Javier Jr.'s sickness. Thus, this Court cannot conclude that the timing of notice was undoubtedly sufficient. This is more properly a question left for the jury.

**(b) March 27, 1995, Tardy**

 On March 27, 1995, Plaintiff called his employer at 10:30 a.m. and relayed the information discussed above. At oral argument Defendant argued that this phone call was made five hours after his shift began and thus was not timely. Defendant relied heavily on the fact that it has a policy that an employee call the sick line thirty minutes before the beginning of his or her shift to avoid receiving a tardy or an absence.

 This Court will not allow the Defendant to proceed with such a theory. The FMLA does not specify a particular time

---

**3.** In the interim regulations, written advance notice pursuant to an employer's internal rules and procedures cannot be required when FMLA leave is involved.

limit as to when an employee must call in and request FMLA leave, rather the FMLA mandates that such notice be "as soon as practicable." § 825.303. Defendant's policy which requires that an employee who will miss work call in one half an hour before his or her shift begins conflicts with the FMLA. The specific purpose of the Act is to deal with situations such as the one presented in this case—a worker having to balance the needs of family and work and needing flexibility to deal with emergency family and medical problems. A company policy that does not allow for such flexibility nor recognize that in FMLA leave situations it may not be possible for an employee to call in one half and hour before a shift begins violates the employee's rights under the Act. Undoubtedly, an employer can establish its own policies for usual and customary notice for requesting general leave. But, such polices must defer to the FMLA when FMLA leave is appropriate.

Indeed, such a conclusion is supported by an example in § 825.303 which provides that: "An employer may also require an employee to comply with the employer's usual and customary notice and procedure requirements for requesting leave ... failure to follow such internal employer procedures will not permit the employer to disallow or delay an employee FMLA leave if the employee gives timely verbal or other notice." § 825.302(d) (interim and final regulations). While this provision is directed towards foreseeable leave it does indicate that an employer may not deny FMLA to an employee who does not comply with internal policies and procedures, so long as he or she complies with the notice requirements of FMLA.

There is an even more compelling reason to afford an employee such flexibly with unforeseeable leave because by definition the employee has even less time and more difficulty adhering to company policy given the exigency of the situation. Moreover, in the case of a medical emergency written advance notice pursuant to an employer's internal rules and procedures may not be required. While the Code does not mention verbal advance notice pursuant to an employer's internal rules, this Court does not see how and

why any distinction should be made. Accordingly, the requirement under the FMLA that notice be "as soon as practicable" controls.

Whether the notice a Plaintiff provides is as soon as practical in terms of its timing depends on the facts and circumstances of each case. *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 761 (5th Cir. 1995). Generally, whether the notice is adequate is a question of fact. *Hopson v. Quitman County Hosp. & Nursing Home, Inc.*, 126 F.3d 635 (5th Cir.1997). Based on the evidence presented or rather not presented to the Court, it cannot say as a matter of law that Mr. Mora's notice was "as soon as practicable." For example, it is not clear to the Court when his shift began, and hence how long into his shift he called his employer. Additionally, assuming arguendo that Mr. Mora did not call at the beginning of the day the Court does not know what circumstances he faced at home and what reasons he had for not calling right away. Therefore, whether the notice provided on March 27, 1995, was "as soon as practicable" is a question for the jury.

**(c) September 26, 1995, Tardy**

Again while not clearly outlined and argued by either party, the dispute with respect to the tardy on September 26, 1995, seems to be when this notice was given and whether it was timely. The Court was not provided with complete depositions and had difficulty piecing together the facts relevant for this determination. Defendant's position is that Mr. Mora and Mr. Corcoran had conversations some time in 1995 regarding his absence problems. At this time Mr. Mora explained that he did not call in one day in September because his son was sick. (Corcoran Dep. "Pl.'s Ex. D" at 28:26–29:7). Plaintiff, perhaps intentionally, cautiously states that Mr. Corcoran was "advised" that he was late. (PRDUSF ¶ 71). Plaintiff does not state when such advisement occurred. While Plaintiff does not reference Exhibit N in this argument, in Exhibit N Mrs. Mora testified that Mr. Mora always called in on the mornings of his absences. (Mrs. Mora Dep. "Pl.'s Ex. M" at 65:1–10).

Recall that an employee shall give notice of the need for unforeseeable leave as soon "as practicable under the facts and circumstances of the particular case." Moreover, If leave is taken for an FMLA reason but the employer was not aware of the reason, and the employee desires that the leave be counted as FMLA leave, the employee must notify the employer within two business days of returning to work of the reason for the leave. 29 C.F.R. § 825.208(e)(1). The evidence presented by Plaintiff does not unequivocally establish that Mr. Mora complied with these notice requirements. At best there is a dispute of material fact as to when he told his employer the reason for his absence on September 26, 1995. Thus, the Court finds that Plaintiff has not established that he satisfied his notice requirements for the September 26, 1995, tardy.

In sum, the Court finds that as a matter of law: 1) Plaintiff was a qualified employee, 2) Plaintiff's son had a serious medical condition which required Plaintiff's care; 3) the content of Plaintiff's notice on March 27, 1995, and September 26, 1995, was adequate; and 4) Defendant's policy that employees call within thirty minutes of the beginning of their shift is inconsistent with the FMLA and is inapplicable to employees requesting FMLA qualifying leave.

The following issues remain to be determined by a jury: 1) whether the content of Plaintiff's notice on October 19, 1994, was sufficient; and 2) whether the timing of Plaintiff's notice on each date in question was "as soon as practicable" given the facts and circumstances of the case.

## V. Plaintiff's Specific Causes of Action– Seventh Cause of Action: Interference with Rights Under FMLA

### A. Introduction

Plaintiff's seventh cause of action is for interference with his rights under FMLA. Specifically, Plaintiff contends that the Defendant failed to fully inform him of his rights and obligations under the FMLA, and used his intermittent time off work to care for his son as a negative factor in employment actions which resulted in his termination. (First Amended Complaint ¶ 13).

The Act states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615.

### B. Wrongful Termination/ Adverse Employment Action

Plaintiff argues that Chem-tronics interfered with his right to take intermittent leave to care of his son because it did not follow FMLA policy and refused to excuse FMLA qualifying absences.

As research did not reveal any decisions by the Ninth Circuit addressing the analytical frameworks for claims of interference, this Court looks to other federal district courts for guidance. Several Courts have found that with respect to intent FMLA is a strict liability statute. *Kaylor v. Fannin Regional Hosp., Inc.,* 946 F.Supp. 988 (N.D.Ga.1996); *Williams v. Shenango Inc.,* 986 F.Supp. 309, (W.D.Pa.1997)(citing *Kaylor* ).

In *Kaylor,* the court reasoned that claims of interference are governed by a strict liability standard such that a Plaintiff need not show that the employer had the subjective intent to violate the statute. The court began by looking at the plain meaning of § 2615(a)(1) which states that it "shall be unlawful for any employer to interfere with, restrain or deny the exercise of or the attempt to exercise, any right provided under this subchapter." § 2615(a)(1). The court explained that "[w]hen a statute uses mandatory language, such as "shall" rather than "may," the Supreme court has interpreted the statute to exclude discretion to take account of equitable or policy factors. In this case the mental state of the defendant when allegedly denying plaintiff valid FMLA intermittent leave is irrelevant." *See Escondido Mut. Water Co. v. La Jolla,* 466 U.S. 765, 772, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984). Hence, an employer who violates § 2625(a)(1) of FMLA is strictly liable regardless of its subjective intent.

Additionally, as the court in *Kaylor* explained, the FMLA as a whole lends further support to a strict liability standard. *Id.* (citing *King v. St. Vincent's Hospital,* 502 U.S. 215, 112 S.Ct. 570, 116 L.Ed.2d 578

(1991) (stating that as a cardinal rule statutes must be read as a whole because the meaning of statutory language depends on context) (citations omitted)). The court reasoned that the lack of any language addressing the intent of the employer to violate the FMLA in § 2615(a)(1) is made clear by 29 U.S.C. § 2617's liquidated damages provisions for "good faith" violations. *See* S.R. 103–3, 103rd Cong., 1st Sess. 3 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 5 (" However, if the employer proves to the satisfaction of the court that it acted in good faith and had reasonable grounds to believe that its acts or omissions were not a violation, the court may, in its discretion, limit the employer's liability to the actual damages."). The presence of a reduced damage option for courts to find a defendant acted unintentionally or violated the FMLA in "good faith" means that even unintentional violators are still liable, and thus supports a strict liability approach for 29 U.S.C. § 2612(a)(1). *Id.* at 997.

Finally, the court cited to legislative history to support its conclusion. Congress expressed its intent to implement the FMLA as a successor to federal labor laws establishing minimum standards for employment:

> The Family and Medical Leave Act (FMLA) accommodates the important societal interest in assisting families, by establishing a minimum labor standard for leave. The bill is based on the same principle as the child labor laws, the minimum wage, Social Security, the safety and health laws, the pension and welfare laws, and other labor laws that establish minimum standards of employment.

*Id.* at 997 (citing S.Rep. No. 103–3 at 6, U.S.C.C.A.N. at 7).

As the court explained by establishing a "minimum standard" for employee leave Congress intended for FMLA leave protected by § 2612(a)(1) to be strictly enforced without any question of an employer's intent to violate the statute: Such intent is only considered when assessing damages. *Id.*

■ This Court is persuaded by the reasoning of the court in *Kaylor,* and accordingly echoes its conclusions. The FMLA is a strict liability statute in the sense that an employee need not delve into the employer's subjective intent to recover for alleged violations for interference.

■ As discussed above, there are questions of fact relevant to whether Plaintiff was entitled to FMLA leave such that his termination for excessive absences was wrongful. Namely, the relevant inquiry is whether the notice provided by Plaintiff was "as soon as practicable." Therefore, this Court cannot grant summary judgment on his seventh cause of action based on this theory. Assuming, however, that the jury finds that Plaintiff satisfied the notification requirements for his absence on March 24, 1995, Plaintiff's total absences drop to 9.5 at the time of his termination in September, such that Defendant's act of terminating Plaintiff in September of 1995 for having 10.5 absences will constitute an interference with the Plaintiff's exercise of his rights in violation of 29 U.S.C. § 2615(a)(1).

**C. Inadequate Notice**

Plaintiff, however, raises an alternative ground for interference. In his First Amended Complaint Plaintiff alleges that the Defendant interfered with his FMLA rights by failing to fully inform of his rights and obligations under the Act as required by statute. As Plaintiff points out in his memorandum of points and authorities this argument is based on a combination of his allegations that the Defendant failed to do each of the following: 1) provide specific written notice of Plaintiff's rights and responsibilities with regard to leave when he first gave notice of the need for FMLA leave; 2) post adequate information regarding FMLA rights and responsibilities in a conspicuous place; 3) include information describing all of an employee's family and medical leave rights and responsibilities into any employee handbook or manual; and 4) responsively answer questions from employees concerning their rights and responsibilities under FMLA.

The preliminary question is whether showing that a Defendant failed to comply with any one of the above mentioned FMLA notice requirements automatically renders the Defendant liable for interference. By the

structure of Plaintiff's argument he seems to concede that violating one notice provision set forth in the statute is not necessarily adequate. Rather, a Court must look at all forms of notice provided by the employer. (Pl.'s Mem. at 16–19). Defendant also argues that the Court must look at all the information Plaintiff received about FMLA. Defendant contends that the notice was adequate and Plaintiff should be "charged" with such knowledge since he received and read the Employee Handbook.

Research has not revealed any court which has held that the failure to comply with any one notice provision in the statute will affix liability for interference. Two courts have addressed this issue to some extent, and have looked to the facts and circumstances surrounding the kind and type of notice an employee received about the FMLA to determine whether a failure to notify an employee of his or her rights amounts to interference. *Lacoparra v. Pergament Home Centers, Inc.*, 982 F.Supp. 213 (S.D.N.Y.1997); *Fry v. First Fidelity Bancorporation,* 1996 WL 36910, 1996 U.S. Dist. LEXIS 875 (E.D.Penn.1996) (cited with approval in *LaCoparra* ).

Citing *Fry* with approval, the court in *La-Coparra* held that " an employer's failure to provide adequate notice of FMLA procedures may constitute interference with an employee's FMLA rights if it causes the employee to forfeit FMLA protection." 982 F.Supp. at 219. The Court explained that the Plaintiff must show that s/he forfeited FMLA rights and obligations as a result of a lack of information provided by the employer. The Court went on to look at all of the notice provided to determine whether the Plaintiff was properly notified of her rights.

In *Fry,* the court found that a failure to comply with § 825.301(a) which directs employers to provide written guidance in the employee handbook would not automatically support a FMLA cause of action. Rather, the Court explained that a violation of the notice provision was only actionable if the inadequate notice effectively interfered with a plaintiff's statutory rights. To determine if such interference occurred the court found it necessary to asses whether pursuant to § 825.301(c) the employer provided specific notice of FMLA rights at the time an employee requested leave. The court explained that an inadequacy in the employee handbook could be cured by providing complete and adequate notice of FMLA rights that time leave was requested. 1996 WL 36910, *4, 1996 U.S. LEXIS 875, *12. Thus, the Court looked at whether on the whole the employer complied with the notice provisions of FMLA to assess whether there was interference.

■ This Court is persuaded by the reasoning in *LaCoparra* and *Ely.* The point of having a notice requirement is to ensure that an employee understands his or her rights and does not forfeit them unwittingly. Arguably, the statute would be unnecessarily harsh if it allowed an employee to recover monetarily under a claim of interference, for the failure to provide one type of notice, if the employee was adequately informed by other means provided by the employer. Accordingly, the Court will assess whether Mr. Mora was adequately notified of his rights.

### 1. The "Notice" of FMLA Given By Defendant

**(a) Failure to Provide A Detailed Written Description of His Rights and Responsibilities**

■ Plaintiff's first argument is that he properly notified Chem-tronics of his intent to take FMLA leave, but was not provided with a written explanation of his entitlement and responsibilities. As explained by the interim regulations "when an employee provides notice of the need for FMLA leave, the employer shall provide the employee with notice detailing the specific expectations and obligation of the employee and explaining any consequences of a failure to meet these obligations." § 824.301(c). The regulation goes on to explain that such notice should include, if appropriate, an explanation that the leave would be counted against his or her annual FMLA leave entitlement, any requirements the employee may have regarding medical certification of a serious health condition, the employee's right to substitute paid leave, any requirement for the employee to make premium payments to maintain

health benefits and the arrangements, and the right to be restored to the same or equivalent job upon return from leave. *Id.*

Chem-tronics does not argue that it gave this notice, instead it takes the position that this obligation was never triggered because Plaintiff did not give notice of his need for FMLA leave. The Court finds this position incorrect. Recall that on October 12, 1994, Mr. Mora gave Mrs. Scherkenback, the company nurse and Health Administrator at Chem-tronics, a note on which she documented that his "son has pigeon infection. Javier must be able to take his son to M.D. when his spinal pressure is going up. It is critical to do a spinal puncture." (Pl.'s Ex. E at 33:10–14). After receiving the note Mr. Mora came into her office to explain his son's illness and he said "he must be able to take his son when—he's very ill." (Pl.'s Ex. E at 35:21–23). Nurse Scherkenback also recalled that Mr. Mora said his son would become ill. At this time her understanding that spinal pressure "is an abnormal high pressure to have a spinal infection. It's like meningitis. If you have a meningitis, you're going to have a high pressure of spinal fluid." (Pl.'s Ex. E at 39:15–18). On October 19, 1994, Nurse Scherkenback received a copy of the consent form Mr. Mora signed for a spinal tap for his son. On this note Nurse Scherkenback wrote that "on 10–18 Javier was off all day, on 10–18 Tuesday, Javier took his son to Kaiser and scheduled Javier for— Javier for a spinal tap on 10–19." (Pl.'s Ex. E at 39:1–5; Ex. 3).

The parties do not dispute that on October 19, 1994, Mr. Mora was not given an infraction for leaving early to take his son to the spinal tap procedure. However, it is also undisputed that after requesting this leave he was not given any written notice of his rights and responsibilities under FMLA. If the Court finds that Plaintiff gave sufficient and timely notice that his request for leave was FMLA qualifying, then Defendant failed to abide by 29 C.F.R. § 825.301(c). The parties do not address whether the leave on October 19, 1994, was foreseeable or unforeseeable. The Defendant does not appear to challenge the timing of this notice rather asserts that the content was insufficient.

### (i) Mr. Mora's Notice Was Adequate

Incorporating the discussion and cases cited therein, *supra* at 1207–15, this Court finds that an employee puts an employer on notice that FMLA is warranted if s/he tells the company nurse practitioner that his child has a pigeon infection which increases spinal pressure making spinal puncture necessary. Especially when, the nurse practitioner admits that she understood that high spinal pressure is a spinal infection like meningitis. Again as a matter of common sense a nurse who is told that spinal taps are necessary for a young child should and would conclude that a serious medical condition was involved or potentially involved warranting further inquiry.

As discussed extensively above, making an employer aware that a child is sick requiring their absence from work may alone be sufficient notice. For example, as previously discussed in *Brannon,* an employee notified his employer that she needed to care for a daughter who was sick. In the instant case, Mr. Mora made it very clear that when his son's spinal pressure went up he was needed to take him to the doctor for a medical procedure. Additionally, on the day in question he informed his employer that he had to take his son to the doctor for a spinal tap. Thus, like the Plaintiff in *Brannon,* his notice was sufficient. Additionally, like the Plaintiff in *Brannon* Mr. Mora did provide an explanation of his son's sickness leaving the nurse with the impression that it was "just like meningitis." Thus, he did put his employer on sufficient notice of his need for FMLA leave.

Accordingly, while Plaintiff was not assessed an absence for his afternoon off he was entitled to written notice of his rights and obligations under FMLA § 825.301. It is undisputed that such written notification was never given. In fact, it appears that the Defendant did not develop such forms to give employees until after Plaintiff's lawsuit was filed. (PRDUSF ¶ 33).

### (b) Failure to Post Adequate Notices

Employers are required to post a notice, large enough to be readily seen by employees

and applicants for employment, in a conspicuous place on the company's premises explaining the Act's provisions and providing information concerning the procedures for filing complaints for violations of the Act with the wage and hour division. 29 U.S.C. § 2619(a); 29 C.F.R. § 825.300(a). As a general rule the failure to post a notice cannot be the sole basis for relief. Employers are not labile to employees of failing to post the required FMLA notices. The Secretary of Labor is the only party who can seek relief from posting violations. *See Blumenthal v. Murray,* 946 F.Supp. 623 (N.D.Ill.1996) (holding that an eligible employee had no basis to seek injunctive relief by asserting a violation of the FMLA's posting requirement). Yet, as discussed above the failure to properly notify an employee of his or her rights under FMLA can amount to interference.[4]

The interim and final regulations are virtually identically and require that an employer must,

post and keep posted on its premises, in conspicuous places where employees are employed, a notice explaining the Act's provisions and providing information concerning the procedures for filing complaints of violations of the Act with the Wage and Hour Division. The notice must be posted prominently whether it can be readily seen by employees and applicants for employment. Employer may duplicate the text of the notice contained in Appendix C of this part, or copies of the required notice may be obtained from the local offices of the Wage and Hour Division.

825.300(a) (interim regulations).[5]

First, there is a dispute as to whether the Defendant even posted a notice. Defendant asserts that it did post a FMLA notice in 1994 and 1995, and cites to the testimony of Ms. Morse, the director of human resources. Ms. Morse states that the postings were placed in cafeterias or on company bulletin boards in 1994 and 1995. (Def.'s Ex. 1 at 116:3–118). Plaintiff cites to the testimony of Corina Cruz a former employee of the Defendant from October 1, 1990 through July 3, 1997. Ms. Cruz worked in the same Department as Mr. Mora, and asserted that " I do not recall seeing any Posting of this law (FMLA), and I am not familiar with what my rights are under this law." (Cruz Decl. "Pl.'s Ex. H" at 2:23–25). Hence, there is a dispute as to whether a notice was posted.

Even assuming that the notice was posted the second issue is whether the notice was adequate. Research did not reveal any case in the Ninth Circuit or other federal circuits addressing what exactly must be contained in the posted notice. By August 3, 1993, the interim regulations of FMLA took effect and they specifically require that an employer must post "a notice explaining the Act's provisions." The regulations further provide that the notice may be taken from either Appendix C of the C.F.R. or from the Wage and Hour division. Arguably, even though Congress used the word may which is more permissive than shall, when read in context it could be said that Congress' intent was that the posted notice be taken from Appendix C or the Wage and Hour Division. Specifically, Congress refers to the notice in Appendix C which is also available at the Wage and Hour Division as the "required notice." The use of term "required" before notice implies that the exact notice in Appendix C is what Congress intended employers use. The use of

---

**4.** Additionally, "an employer that fails to post the required notice cannot take any adverse action against an employee, including denying FMLA leave, for failing to furnish the employer with advance notice of a need to take FMLA leave." 29 C.F.R. § 825.300(b). But, as Defendant explains § 825.300(b) by its own terms only applies when an employee is required to provide "advance" notice of a need for FMLA leave. Advance notice is only required when the need for FMLA leave is foreseeable. As such notice is not required when the need for leave is unforeseeable. Therefore, Plaintiff can not estop the Defendant from asserting that he failed to provide notice as soon as practicable because § 825.300 does not apply. *See, e.g., Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973, 983 (5th Cir.1998) (holding that § 825.300(b) only applies in situations where the employee is required to provide "advance" notice of the need for FMLA leave); *Gay v. Gilman Paper Co.,* 125 F.3d 1432, 1436 n. 6 (11th Cir.1997) (same).

**5.** The final regulations are virtually identical. They add the provision that the notice must be posted whether or not the employer has eligible employees.

the may in the sentence, "Employers may duplicate the text of the notice," could be read as stating that they have permission to copy from Appendix C directly. The employers could also elect to obtain a copy of the notice from the local offices of the Wage and Hour Division. In light of the specific direction as to where an employer could obtain a copy of the mandated notice, Congress' silence with respect to an employers right or ability to draft its own notice could be deemed telling.

On the other hand, Congress did use the word may as opposed to shall which by definition implies that some discretion is involved. Moreover, the reference to "required notice" could be said to refer back to the notion that a posting is required. The reference to Appendix C and the Wage and Hour division may imply that the information contained in such notices is the mandatory minimum that must be included in the Defendant's posting.[6]

 Even assuming that an employer may create its own notice requirement given Congress' direction to Appendix C and emphasis on the required notice this Court holds that notice created by the employer must substantially comply with the notice found in Appendix C. Comparing the notice provided by Chem-tronics and that of Appendix C it is clear that it was inadequate. The notice provided only discussed CFRA rights. It is undisputed that the Defendant never changed this notice after the interim regulations for FMLA took effect in August of 1993. As Plaintiff's claim for interference is based on FMLA and not CFRA the Court will analyze Defendant's failure to comply with FMLA's notice requirements.[7]

The Appendix C notice is divided into six sections that explain: 1) reasons for taking leave, 2) advance notice and medical certification, 3) job benefits and protection, 4) unlawful acts by employers, 5) enforcement, and 6) ways to obtain additional information. On its face the Defendant's notice is clearly inadequate because it neglects to make any reference or give any information concerning unlawful acts by employers, enforcement provisions, and additional information.

Such a failure is particularly egregious in light of the specific mandate in § 825.300 that the notice "provid[e] information concerning the procedures for filing complaints of violations of the Act with the Wage and Hour Division." The Defendant's notice was completely devoid of any mention of enforcement, nor did it make any reference to the U.S. Department of Labor. Moreover, the explanation of the leave that could be taken was false and misleading. It stated that any care "must be taken for at least two weeks, except that you may request a shorter leave (of anywhere from one day to two weeks) on any two occasions during a 25–month period for planned medical treatments." The FMLA does not limit an employee to only two intermittent leave absences in a twenty-five month period. Thus, the Court finds that as a matter of law Defendant's posted notice was inadequate under FMLA.

**(c) Failure to Include Sufficient Information in the Written Manual**

Plaintiff contends that the Defendant's employee manual provided insufficient notice because it did not contain any reference to intermittent leave nor any explanation of how Defendant's no-fault attendance policy would

---

**6.** As Defendant points out in CFRA the California legislature provides a copy of a text of a notice in its regulations but explains that such a text is an example, only contains the minimum requirement of the CFRA of 1993. 2 C.C.R. § 7297.9(d). The C.C.R. also specifically states that employers may develop their own notice policy. However, Plaintiff's claim for inadequate notice is based on the failure to post information about FMLA, thus the Court must rely on FMLA's provisions.

**7.** The Court is cognizant and disturbed by the fact that changes to the CFRA regulation were effective on October 4, 1993, and a notice issued by the Fair Employment and Housing Commission informed employers that "much of the information in the suggested text of the employer notice in Section 7297.9 is now wrong. Until the Commission amends its regulations, employers should remove any such notice which they have posted in their workplace pursuant to the regulation." (Pl.'s Ex. L). Yet, it is undisputed that the Defendant's notice initially posted on July 12, 1993, was never revised despite the changes in both the C.F.R. and FMLA. Thus it contained erroneous information such as "shorter leave" could only be taken on two occasions during a twenty-four month period.

be applied in light of the FMLA. As to the later argument, Plaintiff specifically cites to the fact that the attendance policy does not state that medical absences to care for an employee's family members are not considered an unauthorized absence. Additionally, while FMLA allows employees to provide notice of the leave as soon as practicable, the Defendant's attendance policy mandates that employees call within 30 minutes before their scheduled start time or the absence is considered unauthorized and results in an infraction. (Pl.'s Mem. at 17–18).

It is opposition, Defendant's only argument seems to be that even if it failed to provide information about intermittent leave in the handbook it nonetheless substantially complied with FMLA. While not specifically referenced by the Defendant in its memorandum, it appears that in their response to Plaintiff's Statement of Undisputed Material Facts it argues that because it believes the FMLA notice need not specify intermittent leave, it is not required to include such information in its handbook. Additionally, as to the failure to explain the interaction of its own policies and FMLA Defendant asserts that since the Handbook states that FMLA is up to twelve weeks and may be paid, "while not express, it is nonsensical to conclude a paid leave of such duration would at the same time accrue attendance violations." (PRDUSF ¶ 29).

#### (i) A Manual That Does Not Describe Intermittent Leave is Inadequate

■ If an employer "has any written guidance to employees concerning employee benefits or leave rights, such as in an employee handbook, information concerning FMLA entitlement and employee obligations under FMLA must be included in the handbook or other document." 29 C.F.R. § 825.301(a)(1). An employee is entitled to intermittent leave under the plain language of the statute 29 U.S.C. § 2612. This Court finds that, as a matter of law, an employee handbook that fails to provide such essential information as the kind of leave that can be taken, i.e., intermittent, is inadequate. To hold otherwise renders such rights provided by FMLA meaningless. As Plaintiff points

out, this conclusion is further supported by the fact that under § 825.301(a)(1) for employers who do not have written policies, manuals or handbooks, they, "shall provide written guidance to an employee concerning all the employee's rights and obligations under the FMLA whenever an employee requests leave under the FMLA." 29 C.F.R. § 825.301(b) (emphasis added). "Clearly, the Secretary of Labor did not intend that employees who work for employers with handbooks should receive *less* information about their rights then employees who work for employers that do not have written materials or handbooks." (Pl.'s Reply at 3, n. 2).

Additionally, this Court is not persuaded by Defendant's argument that because the notice provided in Appendix C of the regulations makes no mention of intermittent leave, then such information need not be provided in the handbook. The notice required by the Department of Labor is by no means comprehensive. Moreover, the fact that intermittent leave is not spelled out in the short notices proves all the more that such information must be included in the handbook so the employee is fully apprised of his or her rights and obligations.

To the extent Defendant's argument is based on the fact that § 825.301(b) states that if an employer does not have written policies it may duplicate and provide the employee a copy of the FMLA Fact Sheet available from the nearest office of the Wage and Hour Division, this Court cannot evaluate the argument. Presumably, Defendant believes that no information about intermittent leave is in the Fact Sheet, however, Defendant failed to provided the Court with a copy of such a sheet for evaluation. Accordingly, this Court holds that the fact that Defendant's handbook fails to explain the right to intermittent leave renders it insufficient as a matter of law.

#### (ii) A Manual that Fails to Explain the Interaction Between Conflicting FMLA and Employee Policies is Inadequate

■ Plaintiff's second argument is that the failure to explain the interaction of the FMLA and his employer's own policies also renders the handbook inadequate. First, as discussed *supra* at 1216–17. While the

FMLA requires that employees taking unforeseeable FMLA leave call in "as soon as practicable," Defendant's policy requires that employees call within on half hour of their scheduled start time. If the employee fails to do so, the absence will be considered unauthorized and no sick hours may be used. There can be no dispute that the Defendant failed to explain that the thirty minute rule would not apply to FMLA absences because Defendant took the position at oral argument that its thirty minute rule should control and override the "as soon as practicable," requirement of the FMLA. As previously explained this Court finds such position untenuous. Therefore, the Court holds that as a matter of law that Defendant failed to provide appropriate notice in the written manual, because it failed to explain to employees that if a family emergency that qualifies under FMLA prevents them from calling in thirty minutes before their shift starts they may nonetheless be covered by FMLA leave, so long as they notify their employer as soon as practicable.

■ Second, as Plaintiff explains the Defendant's attendance policy does not state that medical absences to care for an employee's family member are not considered unauthorized absences or tardies. The attendance policy states that,

> all absence, late-ins, and early outs, for reasons other than those included under 'Authorized Absences' identified herein, shall be considered attendance infraction if not fully covered by sick hours. Tardies cannot be covered by sick hours and are considered an attendance infraction ... [i]f an employee is absent from work for a reason not included under "'Authorized Absences,' supervisors are *not* required to determine a specific reason for the absence."

(Pl.'s Ex. B at 117).

While the attendance policy in paragraph 4.9 excludes authorized absences which includes medical, medical absences as defined in the employee handbook are absences for an employee's *own* illness and does not men-

tion anything about leave to care for a family member. (Pl.'s Ex. B at 113). Defendant unpersuasively argues in response that employees should know to read into the word "medical leave" family medical leave and assume that absences to care for family members are authorized absence. This puts too much responsibility on the employee to parse through and cross reference the various provisions of the handbook and absence policies to obtain a complete understanding of their FMLA rights and obligations. It is the employer's burden to adequately inform the employee.

This position taken by Defendant is especially disingenuous in light of the fact that its own supervisors did not understand how the FMLA and their own policies interacted. When Mr. Richardson was asked if an "authorized absence" included FMLA his answer was "Not to my knowledge." (Pl.'s Ex. A at 113). And when explaining why he never gave Mr. Mora any information about his rights under FMLA he asserted that " I was not sure what the policy was, and to explain the policy, I had not details of the exact policy of what it offered." (Pl.'s Ex. B. at 14). Additionally, Mr. Wind testified that he did not know if the term "medical" encompassed any leave that would be available under the FMLA. (Pl.'s Ex. C at 5).[8]

Moreover, the absence policy specifically states that tardies may not be covered by sick leave. Such a statement is erroneous as the FMLA covers intermittent leave which can be in small increments such as hours, and can be covered by accrued sick time. Accordingly, the policy fails to explain how the FMLA right to intermittent leave interacts with the employer's policy concerning tardies. As a result, employees who need to be late to work to care for a family member with a serious medical condition would be mislead into thinking that it would not be a covered absence by FMLA and thus inexcusable under their employer's policy.

**(d) Failure to Fully Inform**

Plaintiff's final argument regarding notice, is that overall his supervisors and managers

---

8. Defendant's argument that such statements are irrelevant because they were not human resource personnel ignores the fact that they had the ability and in fact did assess attendance infractions. (PRDUSF ¶ 30).

were not knowledgeable about the FMLA and failed to fully and adequately inform him of his rights. To begin with, as Mr. Mora explains, the manual refers employees to the human resource department for information about his rights. It states, "[a] full explanation of your rights and obligations under these laws can be obtained through the human resources department." (Pl.'s Ex. B at 112). However, it is undisputed that human resources did not have any additional written information to provide employees. (Pl.'s Ex. B at 26:5).

It is also undisputed that Plaintiff was not told by anyone in human resource or his supervisors that time off he took to be with his son would not count as an infraction. Ms. Morse did not give Plaintiff such information. (Pl.'s Ex. B at 57:2–10). Neither did Mr. Richardson, Mr. Wind, Mrs. Corcoran, or Ms. Scherkenback. (Pl.'s Ex. A at 13:17–14:25; Ex. C at 22:11–15; Ex. E at 29:1–28; Ex. D at 24:15–20). While Defendant tries to argue that Ms. Morse effectively informed Plaintiff of his right to take intermittent leave because she indicated to him that they would "work with him" and would give time off consistent with "our policy," the argument is not persuasive. Given the failure of the manual to explain the right to intermittent leave, such general comments such as "work with him" is problematic. So too is the reference to statements that he could take time off consistent with "our policy." The problem as discussed above was that the policy did not explain that employees could take excused absence to care for a family member, or come in late to work when medically necessary. Furthermore, Ms. Morse indicated that she could not specifically recall ever telling Mr. Morse that time off to be with his son would not count as an infraction. (Pl.'s Ex. B at 57:2–10). Additionally, every other manager/supervisor admitted that they did not tell him specifically that he could take intermittent leave. (Richardson's Dep. at 13:17–14:25; Wind Dep. at 22:11–15; Scherkenback Dep. at 29:1–28; Corcoran Dep. at 24:15–20).

Indeed in conversations with Richardson, Wind, Scherkenback, and Corcoran, Plaintiff never received information about FMLA.

For example, Mr. Richardson admits that he never told Plaintiff of any right to take unpaid leave, intermittent leave, leave covered by vacation or sick days, or leave that did not cancel health insurance coverage because "I was not sure what the policy was, and to explain the policy I had no details of the exact policy of what it offered." (Pl.'s Ex. A at 13:16–18). Likewise, Mr. Wind, Mr. Corcoran, and Ms. Scherkenback admit to never conveying such information. (Pl.'s Ex. C at 22:11–15; Ex. E at 29:1–28; Ex. D at 22–24).

The failure of such individuals to provide pertinent information can hardly be surprising given that they admit they never received any training on either FMLA or CFRA For example, Richardson testified that to his knowledge neither he nor any other manager, supervisor, or employee received any training in the FMLA or CFRA (Pl.'s Ex. A at 47:8–48:1; *See also* Ex. E: 33:19–28; Ex. C at 25:5–21). The lack of employee's knowledge and understanding of FMLA emerges from their deposition testimony. For example, Richardson stated that "I was not sure what the policy was, and to explain the policy I had no details of the exact policy of what it offered." (Pl.'s Ex. A at 13:16–18). Wind testified that he did not know if Chem-tronics had a FMLA or CFRA policy in 1994 or 1995. At his deposition he could not articulate what rights and responsibilities an employee had under the Act. (Ex. C at 7–10). Thus, when Mr. Wind called Plaintiff into his office in March to talk to him about his absence problem he explored options such as taking a regular leave of absence without pay, or changing his shift, but did not address his rights under FMLA. Mr. Mora expressed his concern about working without pay, and Wind mentioned nothing about FMLA and his ability to miss work to care for his son and use his vacation and sick time.

Defendant makes much of the fact that Ms. Scherkenback testified to attending a "meeting of Human Resources personnel in which family care leave was discussed and emphasized and questions were answered." (PRDUSF ¶ 26). However, all her vague testimony establishes at best, is that at one

of the human resources meeting a document was given that addressed family medical leave. This meeting was sometime around the date the document was created, which was July 12, 1993. Nurse Scherkenback could not recall anything specifically that was said or discussed at the meeting concerning this document. Moreover, it is undisputed that the FMLA was enacted and changes were subsequently made, yet, there is no evidence of any further meeting. And in fact, Ms. Morse admits that additional documents were not created until 1997. Finally, it is undisputed that supervisors who made decisions regarding absences and tardies, were never trained in the requirements of the FMLA.

█ In sum, as a matter of law, the Court finds as follows: 1) The Defendant's notice provided in its: a) handbook, and b) posting were inadequate. Looking to the totality of the circumstances this Court finds that the Defendant's notice was insufficient because in addition to the deficient postings and handbook Defendant also failed to provide Plaintiff with written notice of his rights and obligations under FMLA once he gave notice of his need for qualifying leave. Moreover, his superiors were not trained in and did not provide adequate information about his rights and responsibilities under the Act.

## 2. Causal Connection

█ The remaining issue is what if any causal connection a Plaintiff must show between the inadequate notice and alleged harm. Unfortunately, neither party addressed the issue of causation and what showing should be required. Research has only revealed two cases dealing with this issue. *LaCoparra v. Pergament Home Centers, Inc.,* 982 F.Supp. 213 (S.D.N.Y.1997); *Fry v. First Fidelity Bancorporation,* 1996 WL 36910 *4, 1996 U.S. Dist. LEXIS 875 *12 (E.D.Penn.1996). In *LaCoparra,* the court held that "a failure to provide adequate notice of FMLA procedures may constitute interference with an employee's FMLA rights if it causes the employee to forfeit FMLA protections." 982 F.Supp. at 220. In *Fry* the court held that inadequate notice amounts to interference if it "causes an employee to unwittingly forfeit the protection of the FMLA." 1996 WL 36910 at *4, 1996 U.S. Dist. LEXIS at *12. This Court likewise holds that to succeed on a claim for interference based on inadequate notice a Plaintiff must show that the Defendant's failure to inform resulted in the unknowing forfeiture of the protection of FMLA. In other words a Plaintiff must show that s/he qualified for FMLA protection, or that his/her employer caused the ineligibility by failing to properly notify him or her of the FMLA's requirements and/or entitlements.

Plaintiff argues that the failure to provide adequate notice deprived him of the right to make "an educated decision." (Pl.'s Mem. at 19). In his complaint Plaintiff alleges the lack of information resulted in his termination, and prevented him from using accrued vacation and/or sick time intermittently to care for his son. Presumably, part of Plaintiff's theory regarding termination is that his lack of understanding and knowledge of his rights prevented him from complying with his notice obligations under FMLA. As discussed above, the content of Plaintiff's notice was sufficient, but whether Plaintiff notified his employer as soon as practicable is a disputed question of fact, hence a jury must decide if Plaintiff qualified for FMLA protection.

Moreover, this Court cannot conclude that as a matter of law if Mr. Mora was ineligible for FMLA leave on these dates in question, i.e. the Court cannot say that his failure to notify his employer as soon as practicable resulted from his lack of understanding of his rights and responsibilities under the FMLA. Presumably, the only obligation Plaintiff knew of was the requirement that he call in thirty minutes before his shift started to avoid being assessed with an unexcused absence. Plaintiff's failure to do so may well be inconsequential if a jury finds that it was "as soon as practicable," but the Court cannot at this juncture make the causal connection that his failure to do so resulted from inadequate notice about the FMLA.

Plaintiff's second possible theory is that as a result of a lack of information he did not attempt to use or take accrued vacation

and/or sick time intermittently to care for his son. Plaintiff has shown on March 27, 1995, and September 26, 1995, he would have and in fact did take leave to care for his son. However, on both of these dates it appears that Plaintiff was penalized for not phoning his employer in a timely fashion. While the FMLA's and not Chem-tronics' general notice requirements control, as discussed above the Court cannot conclude as a matter of law that Plaintiff was qualified FMLA protection and that a lack of information caused him to forfeit FMLA rights.

Additionally, while Plaintiff did not point the Court to such evidence in his motion, in his interrogatories Plaintiff asserted that on October 25, 1994, November 1 and 2 of 1994, November 23, 1994, and December 12, 1994, he was either late or absent from work to care for his son. (Pl.'s Ex. 1). On each of these days, except for October 25, 1994, Plaintiff was given an infraction because he was tardy, which means that he did not call in a timely fashion. (Def.'s Ex. 10). Hence, the discussion above controls and the Court cannot say as a matter of law that he qualified under the FMLA or that his lack of information caused him to forfeit FMLA rights.

But, with respect to the absence on October 25, 1994, according to the records provided by the Defendant, Mr. Mora received an infraction on this day because no sick time was taken to excuse the absence. If at the time of this absence Plaintiff had accrued vacation or sick time available to cover the absence, then he has shown that his lack of knowledge caused him to unwittingly forfeit his FMLA rights. While it is undisputed that at the time of his termination on September 26, 1995, Chem-tronics paid Mr. Mora for 3.3 hours of unused, accrued sick time and 48.65 hours of unused, accrued vacation time, (PRDUSF ¶ 41), Plaintiff failed to argue to this Court or present any evidence that he had available any such time on October 25, 1994. Without such evidence the Court cannot conclude that his employer's lack of notice caused his ineligibility for

FMLA protection.[9] As a result, the Court cannot grant summary judgment for interference based on the theory of inadequate notice.

### D. Discouraging Mr. Mora From Taking Leave

Plaintiff makes a final argument for interference which is that the Defendant effectively discouraged him from taking any more time off to care for his son. (Complaint ¶ 79). The interim regulations specifically state that such actions can constitute interference. "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.200(b); *see also Williams v. Shenango, Inc.*, 986 F.Supp. 309, 320 (W.D.Pa.1997) (explaining the cause of action of interference based on discouraging an employee from taking leave).

In *Williams,* the Plaintiff notified his employer of the necessity of leave which was denied after the employer suggested that he request a different week for leave. 986 F.Supp. at 320. Williams left against orders denying him leave and may have believed that he was doing so at his own risk, and without the assurances sought to be provided under the FMLA. The court reasoned that lack of assurances could be construed as "discouraging" an employee from asserting FMLA rights. The court explained that a jury could find that the initial response to Williams' request may have "chilled" or otherwise discouraged Williams' assertion of FMLA rights. The court did not explain whether it was necessary prerequisite that a Plaintiff show he or she know of the rights provided by FMLA to be effectively "chilled."

■ This Court holds that a Plaintiff can be discouraged from taking absences whether or not s/he knows that such absences could be covered by the FMLA as opposed to other arrangements an employer might

---

9. To the extent that Defendant argues that Mr. Mora knew of his rights to use accrued sick and vacation time for FMLA leave, as discussed extensively above Mr. Mora was not adequately

informed that FMLA leave could be taken intermittently, thus he would have no reason to think that the option of using sick and vacation time applied in his situation.

make. The bottom line is a Plaintiff is discouraged from doing something that he or she would like to do, but does not do because of a lack of or misinformation.

█ It is undisputed that shortly after Mr. Mora told Chem-tronics that his son had HIV, Chem-tronics refused to accept medical documentation of Mr. Mora's need to care for his son to excuse his absence from work. Nurse Scherkenback testified that on March 30, 1995, she had a conversation with Ms. Morse in which:

> She explained that some considerations have been granted for special M.D. appointments and illnesses for employees and/or their family, and it would not be marked against their attendance, which these three notices from Javier were accepted, not against his attendance. But she made it very clear that I could not accept any more.
>
> Q: What, if anything did she say?
>
> A: She said his attendance was so bad that he would receive a final written notice.
>
> . . . .
>
> Q: And the reason—your understanding of the reason why you were told by Ms. Morse not to accept any more is because Mr. Mora's attendance was so problematic?
>
> A: Correct.

(Pl.'s Ex. E at 22–24).

This Court believes that if Mr. Mora was made aware of the Defendant's decision to not accept any more medical notes or excuse any further absence, that as a matter of law he would be entitled to summary judgment on his inference claim based on a theory of discouragement. This Court does not see how the refusal to accept any more medical notes from a doctor to justify Mr. Mora's absences could do anything other than chill or discourage a Plaintiff from trying to take leave that may have been covered by the FMLA. However, Plaintiff did not point the Court to any evidence or argue that Mr. Mora was aware of Defendant's decision that no more medical absences would be accepted. All Plaintiff has pointed the Court to is the testimony of Ms. Morse and Nurse Scherk-enback to establish that such a directive was given.

The evidence does establish that shortly after this decision was made Michael Wind, Plaintiff's Supervisor met with him and "told him that he was on final written warning, for the March statement." (Pl.'s Ex. C at 15: 10–11). Arguably, the Court could infer that being told he was on final written notice, Plaintiff's understanding was that any additional absences for any reason could result in an infraction. Yet, Plaintiff did not point the Court to evidence to show that during this conversation this became his understanding. Specifically, Plaintiff does not provide his own deposition testimony concerning what happened at this meeting. Plaintiff did not show that he was told that if he needed time to care for his son and notified his employer of such a need it would be granted or refused.

In the evidence provided by Plaintiff, Mr. Wind claims he explored options with the Plaintiff such as a change of shift, or a regular leave of absence to help address his absentee problem. (Pl.'s Ex. C at 15:10–11). Granted, as discussed above Mr. Wind did not discuss Plaintiff's entitlement under the FMLA, however, the failure to discuss the FMLA is not the same as discouraging and employee from taking FMLA leave. Moreover, Plaintiff did not establish that Mr. Wind told Plaintiff that if he needed to be absent to care for his son it would or would not be excused. Thus, the Court cannot conclude that Plaintiff was discouraged from invoking the protection of the FMLA because Plaintiff has not established that he was told or knew of his company's decision to refuse to honor any medically necessary absences, or that he was told or knew that any additional absence for whatever reason would be considered an infraction.

█ Plaintiff also argues that his employer's questions concerning whether Mr. Mora's wife could help care for his son, or whether he had looked into hospice organizations amounts to discouragement. Mr. Wind, Plaintiff's manager, explained that when discussing Plaintiff's absences he did ask if his wife could care for his son. (Wind Ex. C. at 79:13–80:3). Mr. Corcoran, of the Human

Resources Department also questioned Mr. Mora why he needed to care for his son, "because Mr. Mora had a wife, and I didn't comprehend why, you know, that was there." (Corcoran Ex. D at 18:21–23). When asked if he ever suggested to Mr. Mora that he might consider putting his son in a hospice he responded, "I asked him if he had contacted hospice." (Corcoran Ex. D at 34:6–9). From the scattered pages of the deposition testimony provided the Court cannot say as a matter of law that such comments amount to discouragement. From what the Court can discern, it appears that the context in which these statements were made was one in which Plaintiff's employer made some effort to explore ways to help. While the message Mr. Mora may have taken from such statements was that he better explore these options because no further absences from work would be allowed no matter the circumstances, as discussed above Plaintiff did not provide any of his deposition testimony concerning what he took away from this conversation. At this point the Court cannot say, as a matter of law, that the actions of the Defendant amounted to discouragement.

## VI. Third Cause of Action—Violations of Public Policy Under FMLA and CFRA

Plaintiff's public policy claim is based on an allegation of wrongful termination in violation of FMLA and CFRA. (First Amended Complaint ¶¶ 58–63).[10] Neither Plaintiff nor Defendant provide any meaningful discussion as to whether under California Law a violation of CFRA or FMLA should lie. Plaintiff merely states in conclusory fashion that he is entitled to partial summary judgment with respect to his wrongful termination under FMLA and CFRA and cites *Ely v. Wal\*Mart Inc.*, 875 F.Supp. 1422 (C.D.Cal. 1995). In its opposition Defendant only states that "[e]ven if FMLA and CFRA are public polices to which a wrongful termination claim may be tethered under Califor-

nia law, Plaintiff cannot prove on summary judgment that Chem-tronics terminated his employment in violation of such public policies. There simply are too many factual and legal disputes which make summary judgment inappropriate." (Def's Mem. at 21).

Whether Plaintiff can state a claim for wrongful discharge in violation of public policy under CFRA or FMLA is an interesting question of law. There are no decisions from the California Courts holding that termination of an employee for exercising his or her rights under CFRA or FMLA violates public policy such that the employee can state a claim for wrongful discharge. Additionally, there is only one court in the Ninth Circuit that has addressed the issue and it is not binding precedent. *Ely*, 875 F.Supp. 1422.

At oral argument the Court asked the Defendant directly if it disputed whether as a matter of law Plaintiff could bring a cause of action for wrongful discharge in violation of public policy. Defendant asserted that Plaintiff could bring such a claim but whether he could succeed factually was in dispute. Hence, arguably Defendant has waived any right to challenge whether Plaintiff can present a claim for wrongful termination in violation of public policy.

 Nonetheless, the Court will consider the merits of the parties' position that a cause of action can be brought. This Court must anticipate how the California Supreme Court would resolve the issue. In California, a cause of action for a wrongful termination in violation of public policy is a recognized exception to the employment at will doctrine. *Gantt v. Sentry Ins.*, 1 Cal.4th 1083, 1089, 4 Cal.Rptr.2d 874, 824 P.2d 680 (1992). Thus, despite the existence of an employment at will relationship, "the employer's right to discharge an 'at will' employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to

---

**10.** In his moving papers Plaintiff seems to argue that the Defendant is liable for violations of public policy not only for wrongful termination but also for interfering with and discouraging him from taking leave. The Court will not allow plaintiff to proceed with such theories under his third cause of action because as plead the third

cause of action is limited to the theory of unlawful termination. However, to the extent the failure to accept proof of such absences resulted in unwarranted infractions which were used in the termination decision, Plaintiff can use such facts to support his wrongful termination claim.

coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 655, 254 Cal.Rptr. 211, 765 P.2d 373 (1988).

Recently, the California Supreme Court reexamined and restated the elements of a cause of action for wrongful discharge in violation of public policy. *Stevenson v. Superior Court*, 16 Cal.4th 880, 887–90, 66 Cal. Rptr.2d 888, 941 P.2d 1157 (1997). A tortious discharge claim requires that the employee be discharged in violation of a policy that is: "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; 3) well established at the time of discharge; and 4) substantial and fundamental." *Id.* at 894, 66 Cal.Rptr.2d 888, 941 P.2d 1157. In *Gantt*, the California Supreme Court explained why a policy supporting a recovery for tortious discharge must be substantial and fundamental:

> Despite its broad acceptance, the principle underlying the public policy exception is more easily stated than applied. The difficulty, of course, lies in determining whether and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee. That determination depends largely on whether the public policy alleged is sufficiently clear to provide the basis for such a potent remedy ... the policy in question must involve a matter that affects society at large rather than a purely personal or property interest of the plaintiff or employer; in addition, the policy must also be 'fundamental' 'substantial' and 'well established' at the time of the discharge.

1 Cal.4th at 1090, 4 Cal.Rptr.2d 874, 824 P.2d 680.

The only court to address whether an employee may bring a wrongful discharge in violation of public policy based on the CFRA is the Northern District of California.[11]

While the opinion was issued before the California Supreme Court's "restatement" of the cause of action for tortious wrongful discharge in violation of fundamental public policy, this "restatement" does not have any affect on the analysis. *Ely*, 875 F.Supp. at 1424.

In *Ely*, the Defendant argued that a the Family Rights Act was an inadequate source of public policy to support a wrongful discharge claim. The court summarized California case law and concluded that the Defendant's argument was unsubstantiated. The court explained that the public policy of the Family Rights Act as found in the public policy behind FEHA was fundamental in that the policy "inures to the benefit of the public at large rather than to a particular employer or employee." 875 F.Supp. at 1426. The court explained that FEHA specifically announced that it was a policy that inures to the benefit of the public rather that the private employee. Additionally, the court explained that nothing in the Act indicated that it intended to supplant employees' existing common-law remedies one of which was an action for wrongful discharge in violation of public policy. *Id.* at 1422–1428.

Thus, it appears that the court dispensed with the two arguments defendants have previously raised in other cases when faced with a claim for wrongful termination in violation of the public policy of FMLA. Those arguments are: 1) that there is no clear mandate of public policy embodied within the FMLA, and 2) even if FMLA constitutes public policy the court should not recognize a claim because the FMLA provides its own comprehensive remedies. *See, e.g., Gall v. Quaker City Castings, Inc.*, 874 F.Supp. 161 (N.D.Ohio 1995); *Callozzo v. Office Depot, Inc.*, 1998 WL 111628 (N.D.Ill.1998) (unpublished).

The Court in *Ely* did not specifically state that it was presented with the argument that because FMLA provides comprehensive remedies, a cause of action for termination in violation of public policy could not lie. It

---

**11.** The statute specifically addressed by the Court was the Family Rights Act, the predecessor to the CFRA with substantially the same provisions.

appears, however, that the court necessarily dispelled with this argument. It explained that while FEHA, in which the Family Leave Act was contained, conferred new rights and created new remedies, its purpose was not to narrow but to expand the rights and remedies available to victims of discrimination. Hence, it explained that California courts have held that "FEHA does not displace any causes of action and remedies that are otherwise available to Plaintiffs." *Rojo v. Kliger*, 52 Cal.3d 65, 81–82, 276 Cal.Rptr. 130, 801 P.2d 373 (1990).

 Plaintiff, citing *Ely,* states that a claim for termination in violation of public policy is actionable. Defendant failed to argue that Plaintiff could not state a claim for wrongful termination in violation of public policy, and thus did not point the Court to any authority to support such a position, nor has it made any efforts to distinguish or challenge the Northern District's holding. As previously mentioned, at oral argument when the Court directly asked the Defendant whether Plaintiff could legally bring a claim for wrongful termination Defendant answered yes although it felt there were material questions of fact as to whether he could succeed on such a theory. Defendant, failed to persuade this Court that it should diverge from *Ely*. Accordingly, this Court holds that as a matter of law plaintiff can bring a claim for wrongful discharge in violation of public policy. However, given that there are factual questions to be resolved as to whether any of Plaintiff's absences were covered by FMLA summary judgment is inappropriate.

## VII. Sixth Cause of Action—Unlawful Employment Practices Under CFRA

 In Plaintiff's sixth cause of action he claims that Defendant engaged in unlawful employment practices by refusing to grant Plaintiff CFRA leave for his son's serious health condition and unlawfully discharging him from his job. "It shall be unlawful employment practice for an employer to refuse to hire, or to discharge, fire, suspend, expel, or discriminate against, any individual because of any of the following: (1) An individual's exercise of the right to family care leave provided by subdivision (a)." CAL. GOV'T.

CODE § 12945.2(*l* )(1). Given that there are disputed questions of fact as to whether Plaintiff timely notified his employer of the need to FMLA leave, summary judgment cannot be entered based on Plaintiff's claim that he was wrongful terminated. Additionally, as discussed in detail below there are disputed issues of material fact as to whether Plaintiff was the victim of discrimination. Accordingly, Plaintiff is not entitled to summary judgment on his sixth cause of action.

## VIII. Fourth and Fifth Causes of Action—Discrimination and Retaliation

In its moving papers Plaintiff not only failed to point the court to the relevant facts for these two causes of action, but it also failed to articulate the elements for the discrimination and retaliation claims. Plaintiff makes no mention whatsoever of his discrimination and retaliation claim in his memorandum of points and authorities. Thus, Plaintiff has failed to satisfy his moving burden by illustrating to the Court that there are not genuine material facts in dispute with respect to these claims. Contrary to Defendant's position in its papers, the proper response is not to dismiss Plaintiff's claims for discrimination and retaliation but to deny summary judgment.

Even if the Court considered these claims summary judgment at this stage would be inappropriate. No guidelines have yet been established for a prima facia showing of discrimination and retaliation under CFRA. Similarly, no guidelines have been established for the same showing under FMLA. Federal courts faced with FMLA retaliation and discrimination claims have turned to prima facia requirements of other workplace discrimination and retaliation statutes most notably, Title VII, the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA"). *See, e.g., Stubl v. T.A. Systems, Inc.,* 984 F.Supp. 1075 (E.D.Mich.1997) (summarizing federal cases using the ADA and ADEA standards for discrimination and retaliation).

The reasonable assumption is that California State courts who look would do the same. The Ninth Circuit and California state courts

apply the identical analysis to ADA and FEHA claims. *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 271 (9th Cir.1996) ("California relies on federal discrimination decisions to interpret the FEHA. Thus, we proceed with the same analysis for the purposes of both claims [ADA and FEHA]"). Additionally, California courts interpreting FEHA look to federal cases interpreting the ADEA. *Stephens v. Coldwell Banker Commercial Group, Inc.*, 199 Cal.App.3d 1394, 245 Cal.Rptr. 606 (1988). The analysis is the same for retaliation claims. *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir.1988), *cert. denied*, 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989).

### 1. Discrimination

In his fourth cause of action Plaintiff articulates that the Defendant discriminated against him when it terminated him for taking protected leave. (First Amended Complaint ¶ 65). A prima face case of discrimination requires a showing that Plaintiff: 1) Was a member of a protected class (an "entitled" employee); 2) qualified for the position he held; 3) suffered an adverse job action because of his status as an entitled employee. *See also, Peters v. Community Action Committee, Inc. of Chambers–Tallapoosa–Coosa*, 977 F.Supp. 1428, 1434 (M.D.Ala.1997) (summarizing what federal courts have used to show a violation of FMLA rights). If Plaintiff makes a prima facia case, Defendant must come forward with a legitimate reason for any adverse action and Plaintiff must then rebut this reason as pretextual. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891–92 (9th Cir.1994).

There is no dispute that Mr. Mora was terminated not for having 10.5 absences. Point five more absences than allowed by company policy. Given the above discussion there is a dispute as to whether Plaintiff was entitled to FMLA leave in that the parties contest whether Plaintiff timely notified his employer on at least one of the three occasions in question that he needed leave that qualified under the FMLA.

### 2. Retaliation

With respect to retaliation, in his First Amended Complaint, Plaintiff merely states that he was retaliated against for exercising his right to job protected leave, exactly what amounted to retaliation is not specifically delineated in the complaint nor addressed in the moving papers. Hence, its even more difficult to engage in a meaningful analysis of Plaintiff's right to summary judgment under this cause of action. Accordingly, the Court finds that Plaintiff has failed to meet its burden of showing that there are no material facts in dispute, and thus summary judgment is appropriate.

If the Court were to reach the merits, to establish a prima facia case for retaliation Plaintiff must show that: 1) he engaged in activity protected by the FMLA, 2) the Defendant thereafter subjected him to adverse action and, 3) there is a causal connection between the protected activity and the adverse employment action.; *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir.1988), *cert. denied*, 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989) (discussing retaliation). If Plaintiff makes a prima facia case, Defendant must come forward with a legitimate reason for any adverse action and Plaintiff must then rebut this reason as pretextual. *Wallis*, 26 F.3d at 891–92.

While Plaintiff did not discuss retaliation in its moving papers, in its reply to Defendant's motion for summary judgment he stated in passing that "Ms. Morse, the Director of Human Resources, retaliated against plaintiff by instructing Ms. Scherkenback not to accept any more medical excuses for Mr. Mora's absences to care for his son." (Pl.'s Mem. at 5). This fact does not appear to be in dispute.

It appears that Plaintiff may make a prima facia case for retaliation. If the jury finds that Plaintiff provided adequate and timely notice of his absence in March, shortly after engaging in activity protected by FMLA his employer refused to accept any more notes from the doctor and thus would not allow any medically excused leave. The refusal to accept any more medically excused absences, was in effect a denial/termination of his rights under FMLA and would seem to

be an adverse employment action. *Peters,* 977 F.Supp. at 1435.

In *Peters,* two days after returning to work after caring for her sick child the Plaintiff was reassigned to a lower and former position, which had a corresponding reduction in pay. She also testified that she overheard her supervisor, an individual directly involved in the reassignment decision criticizing her for having to take time off to care for her daughter. *Id.* The court held that the Plaintiff made a prima facia case. Similarly, the day after Plaintiff notified his employer of the fact his son was HIV positive and was very sick, his employer determined that it would no longer accept medical notes from doctors to excuse absences. A jury could conclude that such actions amount retaliation.

Even assuming that there were no issues of fact as to whether Plaintiff engaged in FMLA protected activity in March of 1995, to grant Plaintiff summary judgment on this claim would be inappropriate. In his moving papers Plaintiff did not meet his burden of showing that no facts were in dispute, nor explain his theory of retaliation. Thus, Defendant did not have an ample opportunity to respond to his arguments or put forth a nonretaliatory reason. The Court must deny summary judgment as to this claim.

### IX. Affirmative Defenses

Plaintiff moves to strike Defendant's third, eighth, ninth, tenth, eleventh, nineteenth, and twenty-first affirmative defenses. Defendant voluntarily withdraws all but the nineteenth affirmative defense. In the nineteenth affirmative defense, Defendant alleges that Plaintiff was not a member of the class subject to protection under California Government Code §§ 2945.2(1) or 12926. Defendant contends that there is evidence to support this affirmative defense because Plaintiff did not exercise his right to take FMLA absences because he rejected the option of taking family leave, and did not inform Chem-tronics that he wanted to take time off for his son. There is evidence to support this defense with respect to the three absences/tardies in question, but only as to whether he properly notified his employer. As previously discussed, Plaintiff did not "reject" the option of

taking FMLA leave. With this qualification the Court will not strike this affirmative defense. Accordingly, Plaintiff's motion to strike affirmative defense is granted in part and denied as to affirmative defense number nineteen, but only as it relates to adequacy of the notice on the dates in question.

### X. Conclusion

For the reasons set forth above this Court DENIES Plaintiff's motion for summary judgment.

The Court GRANTS as MOOT Plaintiff's motion to strike all of Defendant's affirmative defenses save number nineteen. Defendant is allowed to proceed with this defense as it relates to the three absences/tardies in question to the extent it argues it was not properly notified of the need for leave.

The Court DENIES Defendant's cross-motion for summary judgment for failure to exhaust administrative remedies.

Finally, the Court holds as a matter of law that:

1) Plaintiff was an entitled employee;

2) Plaintiff's son had a serious medical condition that necessitated Mr. Mora's care;

3) The content of Mr. Mora's notice for the afternoon of October 19, 1994, and March 27, 1995, and September 26, 1995 were adequate—whether the content of Plaintiff's notice on the morning of October 19, 1994 and whether the timing of Plaintiff's notice on each date in question was "as soon as practicable" are questions for the jury;

4) Defendant's policy that employees call within thirty minutes of the beginning of their shift is inconsistent with the FMLA and is inapplicable to employees requesting FMLA qualifying leave.

5) Defendant's notice provided in its: a) handbook, and b) posting were inadequate as a matter of law;

6) Plaintiff can bring a claim for violations of public policy under FMLA and CFRA.

**IT IS SO ORDERED.**